**Albert Lee ALLEN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7430.

Court of Appeals of Alaska.

July 26, 2002.

Rehearing Granted Oct. 11, 2002.

Paul E. Malin, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In the early morning of June 15, 1994, Albert Lee Allen was visited by Devron Labat and two female friends. The visit was not friendly: Allen had been dating Labat's long-time girlfriend, Michelle Aquino, while Labat was in prison. Now that Labat had been released from prison, he wanted to convince Allen to stay away from Aquino.

After Labat explained his position to Allen, he left Allen's apartment and walked over to Allen's truck. Allen could see Labat kneeling by the truck, and he thought that Labat was trying to disable the vehicle. Allen armed himself with a butcher knife, crawled out of his apartment through a bedroom window, and approached Labat. When Labat saw Allen coming, he started to run away, but Allen gave chase. Allen caught up to Labat, stabbed him in the stomach, then banged his head on the pavement and kicked him.

Labat died from the stab wound, and Allen was indicted for first-degree murder. At Allen's trial, the jury convicted him of the lesser offense of second-degree murder. Allen now appeals his conviction and his resulting sentence. Allen contends that several errors occurred at his trial, beginning with jury selection and continuing through jury deliberations. We discuss each of these claims below. For the reasons explained here, we conclude that Allen's trial was fair and that his conviction and sentence should be affirmed.

*Allen's claim that the prosecutor tainted the jury panel during the jury selection process by suggesting that Allen would receive a lesser sentence if he were convicted of second-degree murder*

■ During jury selection, one of the prospective jurors stated that she had "philosophical" issues that might not make her a good juror. When the prosecutor asked her to explain these issues, the juror replied that she tended "to root for the underdog". She also expressed doubt whether anyone could ever truly know another person's "[state of] mind or know their intent". This, she said, would make it difficult for her to decide whether a defendant was guilty.

In response, the prosecutor asked the juror how she would react in a hypothetical situation: what if the juror believed that a defendant was truly guilty of first-degree murder, but she also had sympathy for the defendant and believed that he would receive a lesser, more appropriate penalty if the jury convicted him of second-degree murder? In presenting this hypothetical, the prosecutor remarked that "most people [know] that the sentence for first-degree murder has got to be worse than the sentence for second-degree murder".

When the prosecutor made this remark about the disparity between sentences for first- and second-degree murder, Allen's attorney immediately objected. The defense attorney argued that the prosecutor should not be speaking about sentencing at all, and he challenged the factual accuracy of the prosecutor's remark that sentences for first-degree murder are more severe than sentences for second-degree murder. The trial judge, Superior Court Judge Milton M. Souter, told the prosecutor: "[G]et to your point without [getting] into all this sentencing stuff".

Despite Judge Souter's suggestion, the prosecutor returned to the issue of sentencing. He again asked the prospective juror to imagine a situation in which a juror believed that a defendant was guilty of first-degree murder but also believed that the defendant would receive a more lenient, more appropriate sentence if the jury convicted him of second-degree murder. The prosecutor asked the prospective juror if, given her "philosophical bent", she herself would be inclined to engage in this kind of decision-making if she was selected as a juror. When the prospective juror indicated that she was not sure what the prosecutor was asking, Judge Souter interrupted and told the juror that the question was, "Would you compromise your verdict with the idea [of] trying to get a lesser sentence for a defendant that you found to be guilty . . . ?"

The judge then added, for the benefit of all the prospective jurors, that it was "not . . . necessarily true that first- and second-degree

murder [defendants] get different sentences". He also instructed the jurors:

> *The Court:* Under our system, the judge decides the sentence[;] the jury decides guilt or [innocence]. [The defendant's sentence] is left up to the judge, after a further hearing.... So the jury is always instructed [that] you cannot consider the sentence in deciding the guilt question.

On appeal, Allen contends that the prosecutor, through his questions to this prospective juror, "directly injected the impermissible subject of penalty or punishment". He argues that "[o]nce this topic was discussed [in front of] the jury, its influence could not be erased". He further suggests that the prosecutor's comments about murder sentences influenced the jury's decision to find Allen guilty of the lesser offense of second-degree murder.

We do not share this view of the matter. The prosecutor was pursuing a valid goal when he made his comments regarding murder sentences: his questions were designed to see whether the prospective juror, who had expressed a philosophical sympathy for "the underdog", would knowingly support a compromise verdict if she thought that, by doing so, she could obtain a lesser sentence for a defendant. The implicit point of the prosecutor's remarks was to make the juror understand that this kind of decision-making would be improper.

■ This implicit point was made explicit when Judge Souter interrupted the *voir dire.* The judge told the jurors that sentencing was a decision for the judge, not the jury, and that jurors could not consider a defendant's potential sentence when deciding the defendant's guilt or innocence. Judge Souter's instructions cured any potential problem.

■ Finally, we note that even though Allen's attorney objected to the prosecutor's remarks, she never asked Judge Souter to declare a mistrial or to dismiss the existing panel of prospective jurors and summon a new one. Thus, even if we thought that the prosecutor's remarks potentially called for a more drastic remedy than Judge Souter's clarifying instructions, the error would be waived. When a defense attorney believes that an error requires early termination of the trial or other extraordinary relief (such as summoning a new jury panel), the defense attorney must ask the trial judge to take action when action is still possible. The claim of error can not be deferred until appeal.[1]

*Allen's claim that the prosecutor violated a protective order that prohibited any mention of the fact that Allen had served time in jail*

■ Allen's theory of defense at trial was a combination of self-defense and accident. Early in the proceedings against Allen, the trial judge issued a protective order that prohibited the prosecutor from eliciting evidence that Allen had been jailed on a prior assault conviction. Allen contends that the prosecutor violated this protective order during his cross-examination of two defense witnesses, Benjamin Briggs and William J. Toney.

Briggs testified that he had spent time in prison with Labat and that he heard Labat repeatedly threaten to kill Allen. During cross-examination, Briggs asserted that he had not seen Allen since 1997. The prosecutor then asked Briggs to describe the circumstances of his last meeting with Allen. Briggs was beginning to answer, "I was serving ..." when the defense attorney interrupted him and requested a bench conference.

In the bench conference, the defense attorney notified Judge Souter that the meeting between Briggs and Allen had taken place while Allen "was in jail on this charge". She therefore asserted that Briggs's impending answer was "going to violate the protective order". To avoid this problem, the prosecutor announced that he would rephrase his question. When the cross-examination resumed, the prosecutor asked Briggs if his meeting with Allen "was ... a face-to-face

---

1. *See Owens v. State,* 613 P.2d 259, 261 (Alaska 1980) (a defendant should not be allowed to "take a gambler's risk and complain only if the cards [fall] the wrong way"); *see also Turpin v. State,* 890 P.2d 1128, 1130 (Alaska App.1995).

meeting". The defense attorney asked for nothing more.

Briggs finished his testimony without further incident, and then the defense called William Toney. Like Briggs, Toney testified that he had spent time in jail with Labat and he heard Labat repeatedly threaten to kill Allen.

Toward the end of Toney's cross-examination, the prosecutor asked Toney to specify the last time he had seen Allen. Toney seemed to have difficulty with this question:

> *Prosecutor:* When was the last time you saw Albert Allen?
>
> *Toney:* I told you: a couple of months before I went to Palmer [Correctional Center] on a [probation] violation.
>
> *Prosecutor:* In '94?
>
> *Toney:* In '94.
>
> *Prosecutor:* Okay. That was the very last time you'd ever seen Albert Allen [before] today?
>
> *Toney:* No, I seen him again, incarcerated.
>
> *Prosecutor:* Okay. When was the last time you saw Mr. Allen?
>
> *Toney:* When was the last time I saw him?
>
> *Prosecutor:* Yeah. Not "where" or "under what circumstances". When was the last time you saw him?
>
> *Toney:* I haven't seen him for a while.
>
> *Prosecutor:* Okay. Can you give us an idea of what "a while" is?
>
> *Toney:* Years.
>
> *Prosecutor:* Okay. It's been years since you saw him at the Alaska Club. That's '94.
>
> *Toney:* Uh-huh.
>
> *Prosecutor:* Have you seen him since that time?
>
> *Toney:* Have I seen him since that time?
>
> *Prosecutor:* Yeah.
>
> *Toney:* Yeah, I seen him incarcerated.

At Toney's second mention of Allen's incarceration, the defense attorney objected. Out of the jury's presence, she accused the prosecutor of purposely violating the protective order—by posing questions to Toney when he knew that Toney's answers would include the information that Allen had spent time in jail. Based on this alleged misconduct, the defense attorney asked for a mistrial, but Judge Souter denied this request.

On appeal, Allen renews his contention that the prosecutor knowingly violated the protective order and that Judge Souter should have declared a mistrial. But the record does not support Allen's assertion of knowing misconduct.

Toney twice mentioned the fact that he had spoken with Allen in jail. As shown by the excerpt quoted above, Toney's first mention of this fact was not a responsive answer to the prosecutor's question ("That was the very last time you'd ever seen Albert Allen [before] today?"). Rather, Toney volunteered this information.

Even though Allen's attorney did not object to Toney's first mention of Allen's incarceration, the prosecutor took steps to make sure that Toney did not repeat this answer. He explained to Toney that he was *not* seeking information about where or under what circumstances the meeting occurred. Rather, the prosecutor told Toney, he was only asking Toney to describe *when* the meeting took place. In response, Toney again volunteered that he and Allen saw each other when they were incarcerated.

■ Given this record, Judge Souter could properly reject the defense attorney's assertion that the prosecutor had engaged in misconduct. The judge could reasonably conclude that the problem was caused by a defense witness who ignored the wording of the prosecutor's questions and volunteered non-responsive information on his own. Under these circumstances, the issue confronting Judge Souter was whether to grant a mistrial because of Toney's non-responsive answers.

Allen's attorney told Judge Souter that, to make the best of a bad situation, she might later ask the judge to instruct the jurors not to hold Allen's incarceration against him. But the defense attorney contended that no cautionary instruction would be sufficient to cure the prejudice to Allen's case—that "a

mistrial [was] the only appropriate remedy". Allen takes the same position on appeal.

■ Generally, an appellate court will defer to a trial judge's decision as to whether a particular reference to inadmissible evidence can be cured with a clarifying or cautionary instruction or whether, instead, a mistrial is needed. We defer to the trial judge because the judge "has the opportunity to hear the tainted evidence as it is presented and to observe the impact it has on the jury".[2]

In several prior cases, both this court and the Alaska Supreme Court have upheld trial judges when they declined to order a mistrial under similar circumstances. For example, see *Hines v. State*[3], in which a prosecution witness referred to the defendant's prior offenses, and *Preston v. State*[4], in which a prosecution witness referred to the fact that the defendant was on probation.[5]

Here, the challenged testimony did not refer to specific criminal activity by Allen, but rather to the fact that Allen had been incarcerated some years before, for an unexplained reason. Judge Souter could reasonably conclude that a cautionary instruction— if such an instruction was requested—would suffice to cure any potential prejudice. In other words, Judge Souter could reasonably reject Allen's argument that a mistrial was the only proper course of action. We therefore hold that Judge Souter did not abuse his discretion when he denied Allen's request for a mistrial.[6]

*Allen's claim that the trial judge refused to grant him a continuance to prepare to answer newly-disclosed evidence*

■ Allen took the stand at trial and testified that he acted in self-defense. One of the subjects that Allen addressed in his testimony was the fact that he called the 911 emergency operator just after Labat left his apartment. In this phone call, Allen explained to the 911 operator that a man had just come to his apartment and threatened him. But when the operator told Allen that he would send the police to Allen's apartment, Allen replied that he would handle the situation himself.

To explain why he armed himself and approached Labat rather than waiting for the police to arrive, Allen told the jury that, based on past experience, he believed that he could not afford to wait for the police. Allen described how, in 1993, he had called 911 when someone shot out the window of his car, and the police did not arrive until almost two hours later. He also described another incident in which someone broke the window of his vehicle and, although the police responded more quickly, they still took a long time to arrive.

Allen gave this testimony toward the end of the trial day. Shortly after the trial recessed, the prosecutor disclosed new information to Allen's attorney: copies of three police reports that were prepared after the police responded to reports of vandalism from Allen in 1992, 1993, and 1994. (Two of these reports described the window-breakage incidents described in the previous paragraph; the third dealt with an incident in which Allen reported that his tires had been slashed.)

When court reconvened the next morning, Allen's attorney did not object to the fact that this material had just been disclosed. However, she did object that the material was not complete. The defense attorney pointed out that the police report from 1992 was accompanied by a copy of the 911 dispatch (the computer-generated memo or log

---

**2.** *Brown v. State*, 693 P.2d 324, 327 (Alaska App. 1984).

**3.** 703 P.2d 1175, 1178–79 (Alaska App.1985).

**4.** 615 P.2d 594, 603–04 (Alaska 1980).

**5.** *See also Mustafoski v. State*, 954 P.2d 1042, 1045–46 (Alaska App.1998) (testimony that the defendant was a drug dealer; no mistrial required); *McPherson v. State*, 800 P.2d 928, 929–930 (Alaska App.1990) (testimony that the defendant had sold marijuana to minors; no mistrial

required); *Srala v. Anchorage*, 765 P.2d 103, 105–06 (Alaska App.1988) (testimony that the defendant asked the police to "give him a break" since they had never given him a break before; no mistrial required).

**6.** *See Noah v. State*, 887 P.2d 981, 983 (Alaska App.1995) (a trial judge's decision to grant or deny a request for a mistrial is reviewed using the "abuse of discretion" standard).

describing the call for assistance), but the police reports from 1993 and 1994 did not have this supporting paperwork. The defense attorney asked Judge Souter to order the prosecutor to produce the 911 dispatches from 1993 and 1994.

But Judge Souter was not inclined to interrupt the trial until the two 911 dispatches were produced. He pointed out that the trial was nearing its end, and he declared that the defense attorney should have foreseen that this material might be relevant and should have requested it earlier. Given these circumstances, Judge Souter said, "The question is whether, on the last day of trial, ... we're going to have a continuance for you to get ... this information. I don't think so."

In reply, the defense attorney clarified that she was only seeking the two 911 dispatches from 1993 and 1994—documents that were, in all likelihood, readily available to the State (since the State had already produced the 911 dispatch from the earliest incident, 1992). When Judge Souter heard the defense attorney's explanation, he indicated that he now understood the limited nature of her request:

> *The Court:* Okay. So your point ... is that you believe the 911 computer information from these two later calls would probably be available ...
>
> *Defense Attorney:* Right.
>
> *The Court:* ... because you have [already] received [the] computer information relating to an older 911 call.
>
> *Defense Attorney:* Yes, Your Honor.

Judge Souter then addressed Detective Leo Brandlen, the lead investigator in the case:

> *The Court:* Can you make a call and get those [two 911 dispatches] for us very quickly—so we can have them today, do you think?
>
> *Det. Brandlen:* Yes, sir.
>
> *The Court:* [By] later this morning?
>
> *Det. Brandlen:* Hopefully, I'd be able to access the computer at [the Anchorage Police Department] warrants [office in] the old building [*i.e.*, the Boney courthouse], and [so the documents] may be available earlier than that, Your Honor.

> *The Court:* Will you, right now, do what you can?
>
> *Det. Brandlen:* Yes, sir.

At this point, Judge Souter asked the attorneys, "Is there anything else we need to take up?" The defense attorney's only request was for "a minute to talk to Mr. Allen, to explain to him what the court's rulings are". Judge Souter announced that the court would stand in recess for "two or three minutes".

When the court reconvened, the prosecutor continued his cross-examination of Allen. Allen's attorney never made another request regarding the 911 dispatches from 1993 and 1994. Presumably, she received them.

On appeal, Allen characterizes this incident in a very different way. He asserts that the State failed to make timely disclosure of police reports under Alaska Criminal Rule 16(b) and then, when the discovery violation came to light, Judge Souter summarily rejected the defense attorney's request for a continuance of the trial so that she could prepare to meet this tardily disclosed evidence.

This is simply not true. As just explained, Allen's trial attorney never asserted that the State violated Criminal Rule 16 with regard to the police reports or the 911 dispatches, nor did the defense attorney seek a continuance of the trial (other than the short recess that was granted by Judge Souter). This short recess was apparently all that was needed for the State to produce copies of the two documents that the defense attorney wanted: the 911 dispatches from 1993 and 1994. In other words, the record of Allen's trial fails to support his claim of error.

*Judge Souter's ex parte contact with the jurors during their deliberations*

■ Allen's case went to the jury on March 8, 1999. On the afternoon of March 10th, the jury announced that they had reached a decision, and the parties assembled in court to hear the verdict. But before the jury was brought into the courtroom, Judge Souter informed the parties of an incident that had occurred earlier that afternoon:

*The Court:* During deliberations this afternoon, the bailiff informed me that the jurors could not get the video machine to work. I said, ... "Why don't we just have one of the jurors come out of the jury room and I'll show them how to work the video machine." ... So the juror came out and said, "Oh, no; the machine is working. We just can't find the spot on the videotape [that we are looking for]." I said, "Well, I'll find it for you." ...

[It] was the videotape of the defendant's interview at the police station, and [the jurors] had the videotape [positioned] in the middle of the [tape]. That's where they were looking for [the interview:] in the middle of the videotape. Apparently, that's where [the tape] was when they got it, so they thought [that that was] where the interview was—in the middle of the tape.

*Defense Attorney:* Was there any ...

*The Court:* Well, I searched around and looked. I couldn't find it anywhere in the middle of the tape, so I went and did the usual thing[: I] went back to the beginning of the tape, and that's where it was.... So then I sent the [video machine] back into them, and they took it from there. So ...

*Defense Attorney:* Was there anything else on the video but ... what we've seen?

*The Court:* No, that's the admitted exhibit.

*Defense Attorney:* Okay.

. . .

*The Court:* So that's what occurred. And I presume [there are] no objections to that. That's a ministerial thing—getting the exhibit [positioned] so they could find it.

*Defense Attorney:* No objection, Your Honor.

Judge Souter then summoned the jury to the courtroom to announce their verdict. The jury announced that they had acquitted Allen of first-degree murder but had convicted him of second-degree murder.

On appeal, Allen argues that Judge Souter violated his rights under the federal and state constitutions by having contact with the jury—or, more precisely, with one juror— without Allen and his attorney being present. In his brief, Allen asserts that "Judge Souter met with an individual juror privately outside the jury room[,] spoke to this juror about the evidence on the videotape[,] ... and permitted the playback of testimony to the jury in [Allen's] absence."

The first portion of this assertion is supported by the record: Judge Souter told the parties that he had spoken to an individual juror outside the jury room. But the record does not support the other two portions of Allen's assertion. There is nothing in the record to support Allen's claim that Judge Souter "spoke to the juror about the evidence on the videotape"—except in the limited sense of ascertaining what portion of the tape the jury wished to review. Further, there is no factual basis for Allen's claim that Judge Souter permitted a playback of testimony in the absence of Allen and his attorney. The incident under discussion involved the jury's effort to play a videotape that had been admitted into evidence as an exhibit. It is proper for a jury to play an audio or video exhibit during their deliberations.

Indeed, during her summation to the jury, Allen's attorney told the jurors that Allen's interviews with the police were important evidence supporting his claim of self-defense, and she encouraged the jurors to play those tapes "whenever [and] however often you want". Thus, the record does not support Allen's claim that Judge Souter engaged in improper conduct.

Equally important, Judge Souter disclosed his contact with the juror to Allen and his attorney before the trial ended. Allen's attorney had a chance to question the judge about the incident; she also had a chance to object to the judge's action or to ask for *voir dire* of the juror involved. Instead, the defense attorney announced that she had no objection to the judge's action.

When Allen's attorney declared that she had no objection to what had occurred, she knew that the jury was about to announce its verdict. In other words, rather than investigating the matter further or requesting a mistrial, the defense attorney chose to go forward and allow the jury to return its

verdict. By doing so, she waived any appellate objection to Judge Souter's actions.[7]

*Allen's claim that the jury instruction on self-defense precluded him from asserting that his fear of imminent danger arose from the actions of more than one person*

■ As explained above, Allen defended the murder charge by asserting that he acted in self-defense. The jury was instructed that Allen was authorized to use force "upon another person" to the extent that Allen reasonably believed he was about to be subjected to "the use of unlawful force by the other". The jury was also told that "[t]he law of self-defense is designed to [protect] one who is beset by an aggressor and confronted by a necessity not of his own making".

Allen's trial attorney did not object to these instructions. However, on appeal, Allen claims that these instructions constituted plain error. Allen argues that these instructions misled the jury because they refer to a defendant's right to protect himself from "another person"—*i.e.*, a single aggressor. Allen claims that these instructions precluded him from arguing that he faced potential danger from two aggressors—*i.e.*, from Labat and one of his female companions, Julie Yourell.

Because the defense attorney did not object to these jury instructions, Allen must show that these instructions constituted "plain error"—*i.e.*, that these instructions were so obviously wrong that any competent judge or attorney would have recognized the problem, and that the error in the instructions manifestly prejudiced the jury's deliberations.[8]

Allen relies on a decision of the Colorado Court of Appeals, *People v. Cuevas,* 740 P.2d 25 (Colo.App.1987), for the proposition that when a defendant faces potential menace from a group of attackers, the jury instructions on self-defense should direct the jurors to consider the total danger to the defendant from all potential assailants—and not just the danger posed by "the victim" (*i.e.*, the particular person whom the defendant ultimately hurts or kills)—when gauging the reasonableness of the defendant's response.[9] However, the Colorado court specifically stated that even though the typical Colorado instruction on self-defense refers only to "the victim", that instruction "does not constitute plain error".[10]

Allen also relies on *State v. Irons,* 101 Wash.App. 544, 4 P.3d 174 (2000), in which the Washington Court of Appeals reversed a criminal conviction because of this same flaw—a self-defense instruction that directed the jury to consider only the danger posed to the defendant by "the victim", as opposed to the total danger posed by all potential assailants.[11] But the defendant in *Irons* preserved the issue for appeal by asking the trial judge to clarify this point of law for the jurors.[12]

The point of law that Allen raises is unexceptionable. When a defendant claims that a charged assault or homicide was in fact an act of self-defense prompted by the danger posed by a group of attackers, the defendant is entitled to have the jury assess the defendant's actions in light of the total danger posed (or apparently posed) by the group, and not just the danger posed by the victim named in the indictment.

But Alaska's pattern self-defense instructions do not refer to "the victim". Rather, as demonstrated by the instructions in Allen's case, Alaska jury instructions on self-defense

---

7. *See Owens v. State,* 613 P.2d 259, 261 (Alaska 1980); *Turpin v. State,* 890 P.2d 1128, 1130 (Alaska App.1995) (a defendant should not be allowed to "take a gambler's risk and complain only if the cards [fall] the wrong way").

8. *See Aviation Associates, Ltd. v. TEMSCO Helicopters, Inc.,* 881 P.2d 1127, 1131 n. 7 (Alaska 1994) ("Plain error exists when a jury instruction obviously creates a high likelihood that the jury [followed] an erroneous theory resulting in a miscarriage of justice.") (quoting *Ollice v. Alyes-*

*ka Pipeline Service Co.,* 659 P.2d 1182, 1185 (Alaska 1983)).

9. *Cuevas,* 740 P.2d at 27.

10. *Id.*

11. *Irons,* 4 P.3d at 182–83.

12. *Id.* at 177.

speak about a defendant's right to use force "upon another person" to the extent that the defendant reasonably believed that they were about to be subjected to "the use of unlawful force by the other". Because Alaska's instructions do not focus on the "victim", they do not create as blatant a danger of misinterpretation as the jury instructions that were criticized in the decisions from our sibling states.

It is perhaps theoretically possible that Alaska's self-defense instructions might be misinterpreted in the way Allen suggests. But Allen did not object to these instructions, so he must show plain error. That is, for Allen to prevail on appeal, he must show more than a theoretical possibility of misinterpretation. Allen must show that the challenged jury instructions obviously and manifestly prejudiced the fairness of his trial. Here, they did not.

Allen's attorney did in fact argue to the jury that Allen faced danger from more than one aggressor. She told the jurors that "[Julie] Yourell and [Devron] Labat ... were the first aggressors[, and] Albert Allen feared for his life ... when he [was] confronted by Devron Labat and Julie Yourell". A few minutes later, the defense attorney reiterated this theme, telling the jurors: "[You must] decide who was the initial aggressor.... [W]e say [that it was] Devron Labat and, with him, Julie Yourell."

In his rebuttal, the prosecutor did not argue that self-defense only applied to aggression from the victim or from any single person. Rather, the prosecutor argued that Allen had not acted in self-defense at all—that any danger to Allen was over when Allen decided to chase Labat and kill him.

The potential flaw in the jury instructions was a subtle one. Given the final arguments of the parties, we conclude that there is no reasonable possibility that the jury was misled concerning Allen's right to argue that his actions were justified by the danger he faced from Labat and Yourell in combination. We therefore conclude that Allen has failed to show plain error.

*Allen's argument that factors employed to aggravate or mitigate a second-degree murder sentence must be proved by clear and convincing evidence rather than by a preponderance of the evidence*

 Normally, factual issues at sentencing are decided under the "preponderance of the evidence" standard of proof. That is, the sentencing judge decides whether the disputed factual assertion is more likely true than not. *See* AS 12.55.025(i) and *Brakes v. State,* 796 P.2d 1368, 1372 n. 5 (Alaska App.1990). However, the legislature has declared that a higher standard of proof governs certain sentencing issues.

When the government asserts that a defendant's prior felony conviction triggers a presumptive term (or triggers a greater presumptive term), the legislature has mandated that the government prove the conviction beyond a reasonable doubt. *See* AS 12.55.145(d). In *Huf v. State,* 675 P.2d 268, 273–74 (Alaska App.1984), we concluded that, by analogy to AS 12.55.145(d), the legislature intended to have this same burden of proof apply to the government's proof of the other factual assertions that trigger a greater presumptive term under AS 12.55.125(c)—for example, possession of a firearm.

 The legislature has also specified a higher standard of proof—proof by clear and convincing evidence—when the government or the defendant asserts under AS 12.55.165 that there are extraordinary circumstances that would justify the three-judge statewide sentencing panel in imposing a sentence outside the normal rules governing presumptive sentencing. This same "clear and convincing evidence" standard of proof applies to the aggravating and mitigating factors listed in AS 12.55.155(c)-(d) that authorize a sentencing judge to depart from the presumptive term established by the legislature for the defendant's crime. *See* AS 12.55.155(f). In *Buoy v. State,* 818 P.2d 1165, 1167–68 (Alaska App.1991), this court concluded that, by analogy to AS 12.55.155(f), the government must meet the "clear and convincing evidence" standard when it alleges aggravating factors that will authorize a sentencing judge to exceed the *Austin* ceiling—*i.e.,* authorize the judge to sentence a first felony offender to a term of imprisonment exceeding the presumptive term for a second felony offend-

er convicted of the same offense.[13] The Alaska Legislature has now codified the *Buoy* decision in AS 12.55.025(i) and AS 12.55.125(k)(2).

Finally, the legislature has mandated the "clear and convincing evidence" standard of proof when the government asks a sentencing court to impose a mandatory 99–year sentence on a first-degree murder defendant under AS 12.55.125(a)(3) by asserting that the defendant subjected the victim to substantial physical torture.

In this appeal, Allen argues that the "clear and convincing evidence" standard of proof should also apply to second-degree murder cases when the government relies on aggravating factors (or the defendant relies on mitigating factors) to argue that the sentencing judge should impose a sentence outside the 20– to 30–year benchmark range established in *Page v. State.*[14]

Allen's argument appears to be inconsistent with AS 12.55.025(i), which declares that (with certain specified exceptions) "the preponderance of the evidence standard of proof applies to sentencing proceedings". Moreover, Allen's argument ignores the fact that aggravating and mitigating factors do not play their normal legal role in a second-degree murder sentencing.

■■■ The normal role of aggravators and mitigators is to expand the sentencing judge's legal authority in cases governed by presumptive sentencing. Proof of aggravators authorizes the judge to impose a sentence above the presumptive term, while proof of mitigators authorizes the judge to impose a sentence below the presumptive term.[15]

But second-degree murder is not governed by presumptive sentencing.[16] This means that, even without proof of aggravators or mitigators, a sentencing judge is authorized to impose any sentence within the 10– to 99–year range established by the legislature for

this offense. *See* AS 12.55.125(b). True, our decision in *Page* restricted sentencing judges' discretion by establishing a 20– to 30–year benchmark range. Nevertheless, a sentencing judge may impose a sentence outside this range for any good reason—not only upon proof of the aggravators and mitigators listed in AS 12.55.155(c)-(d).

■■■ It is true that in second-degree (and first-degree) murder sentencings, the parties often frame their arguments in terms of these statutory aggravating and mitigating factors. We have recognized and approved the practice of "[using] these factors as points of reference ... when [evaluating] how [a specific] offense should be viewed in comparison to a typical ... murder".[17] Nevertheless, a sentencing judge is not limited to the statutory aggravating and mitigating factors when deciding whether the circumstances of the defendant's case call for a sentence outside the *Page* benchmark range. As we noted in *Brown v. State,*

> There are few legal restrictions on the types of factors that a sentencing court can consider when assessing whether a particular sentence should fall outside the benchmark range [for second-degree murder]. As we stressed in *Williams* [*v. State,* 809 P.2d 931, 934 (Alaska App.1991)], "any sound reason may be relied on to differentiate one case from another."

973 P.2d 1158, 1162 (Alaska App.1999).

Because aggravators and mitigators do not have the same legal significance at a murder sentencing, and because the legislature has recently codified its preference for the "preponderance of the evidence" standard of proof at sentencing, we reject Allen's contention that aggravators and mitigators must not be considered by a judge at a murder sentencing unless these factors are proved by clear and convincing evidence.

**13.** *See Austin v. State,* 627 P.2d 657, 657–58 (Alaska App.1981).

**14.** 657 P.2d 850, 855 (Alaska App.1983).

**15.** *See* AS 12.55.155(a).

**16.** *See* AS 12.55.125(b); *Gustafson v. State,* 854 P.2d 751, 763 (Alaska App.1993); *Weitz v. State,* 794 P.2d 952, 957 n. 3 (Alaska App.1990).

**17.** *Sakeagak v. State,* 952 P.2d 278, 284 (Alaska App.1998).

We note that the "preponderance of the evidence" standard appears to favor neither the government nor the defendant. Rather, this standard of proof only expands the information (both favorable and unfavorable) that a sentencing judge can rely on. That is, the "preponderance of the evidence" standard allows a sentencing judge to take account of aggravating and mitigating circumstances even though the proponent of these circumstances may not be able to prove their point by clear and convincing evidence.

### Allen's claim that his sentence is excessive

Judge Souter sentenced Allen to serve 66 years in prison for the murder of Labat. On appeal, Allen argues that this sentence is too severe, given the fact that Labat repeatedly threatened to kill Allen and that Labat was the initial aggressor in the incident that led to the homicide.

At the sentencing hearing, Judge Souter noted that, at the time of the homicide, Allen had three prior convictions for assault—two felonies and one misdemeanor. He further noted that while Allen was incarcerated in connection with this murder charge, Allen assaulted a corrections officer and was convicted of misdemeanor assault.

Judge Souter agreed that Allen had been provoked by Labat. The judge noted that Labat had come to Allen's residence and had made "dire threats" to Allen—threats of what Labat would do to Allen if Allen continued his relationship with Labat's girlfriend. But Judge Souter concluded that "although violence was threatened, no violence was offered". The judge found that Labat was not armed when he came to Allen's house, and he further found that Allen knew that Labat was unarmed. Judge Souter acknowledged that Allen had testified at trial that he believed Labat was armed with a handgun, but the judge declared that Allen's testimony on this point had been "just perjury". "This man never believed that the victim had a gun, or he never would have chased him with a knife."

Judge Souter found that Allen chased Labat "[while Labat] was running away ... in ... totally frightened retreat—complete retreat, running headlong down the street, ... trying to avoid this defendant". He found that Allen "pursued [Labat] over 200 feet down the street, and once or twice around a pickup truck, in order to stab him". Judge Souter further found that, after Allen stabbed Labat, he "violently smashed [Labat's head] to the pavement ... [and] started stomping on the victim's head. And then, after he did that, [Allen] kicked the victim's body so violently that he lifted him up off the pavement".

In sum, Judge Souter concluded that even though Labat offered Allen some provocation, Allen's response was "completely out of proportion". Allen "totally flew off the handle and became irrational and acted entirely outside the law" when he armed himself with a knife and chased Labat down the street. The judge found that Allen's offense was among the most serious within the definition of second-degree murder because Allen intended to kill Labat. That is, the judge found that Allen was factually guilty of first-degree murder.

Given these findings concerning Allen's offense and his history of assaultive conduct, Judge Souter was not clearly mistaken when he sentenced Allen to 66 years in prison.[18]

### Conclusion

The judgement of the superior court is AFFIRMED.

---

**18.** *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).