Albert Lee ALLEN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9343.

Court of Appeals of Alaska.

March 16, 2007.

Daniel Lowery, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

In the early morning of June 15, 1994, Albert Lee Allen was visited by Devron Labat and two female companions. The visit was not friendly: Allen had been dating Labat's long-time girlfriend, Michelle Aquino, while Labat was in prison. Now that Labat had been released from prison, he wanted to convince Allen to stay away from Aquino.

After Labat explained his position to Allen, he left Allen's apartment and walked over to Allen's truck. Allen could see Labat kneeling by the truck, and he thought that Labat was trying to disable the vehicle. Allen armed himself with a butcher knife, crawled out of his apartment through a bedroom window, and approached Labat. When Labat saw Allen coming, he started to run away. Allen gave chase. Allen caught up to Labat, stabbed him in the stomach, then banged Labat's head on the pavement and kicked him. Labat later died from the stab wound, and Allen was indicted for first-degree murder.

Allen was tried three times for this crime. His first trial ended in a hung jury. At his second trial, the jury found him guilty, but this Court reversed Allen's conviction on appeal. *See Allen v. State*, 945 P.2d 1233, 1234–35 (Alaska App.1997). Allen was then tried a third time. This time, the jury convicted him of the lesser offense of second-degree murder. Allen appealed again, but this time we affirmed Allen's conviction and sentence. *See Allen v. State*, 51 P.3d 949, 952 (Alaska App.2002), *on rehearing* 56 P.3d 683 (Alaska App.2002).

Following our affirmance of Allen's murder conviction, he filed a petition for post-conviction relief. In this petition, Allen argued (under various theories) that the two attorneys who represented him at his third trial gave him ineffective assistance of counsel. He also argued that the procedure at his sentencing hearing violated his Sixth Amendment right to jury trial as interpreted by the United States Supreme Court in *Blakely v. Washington*.[1]

---

1. 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

Superior Court Judge Peter A. Michalski ultimately granted the State's motion to dismiss Allen's petition on the pleadings. That is, Judge Michalski concluded that Allen's petition and supporting documents failed to present a prima facie case for post-conviction relief.

Allen now appeals the superior court's dismissal of his petition. However, he has abandoned all of his claims except two.

Allen's first remaining claim is that his trial attorneys acted incompetently when they failed to call two witnesses, Jim Snyder and Michelle Kary Arms, during the defense case at Allen's trial. According to Allen, these two witnesses would have provided important testimony to support Allen's own testimony that he thought that Labat was armed with a gun, and that he (Allen) was acting in self-defense when he chased Labat and stabbed him. In this appeal, Allen does not assert that the superior court should necessarily have granted his petition for post-conviction relief. Rather, Allen makes the more limited assertion that the superior court should not have dismissed his petition on the pleadings—i.e., without granting him a hearing on these two claims.

Allen's second remaining claim is that his sentencing procedures violated *Blakely*.

For the reasons explained here, we conclude that Allen's petition failed to state a prima facie claim for post-conviction relief on either theory. Thus, the superior court acted properly when it dismissed Allen's petition.

*Allen's claim of attorney incompetence, and a description of the four affidavits filed with his petition: the affidavits provided by his two trial attorneys, by the investigator who worked for those attorneys in preparing for Allen's trial, and by the new investigator who worked on Allen's petition for post-conviction relief*

At his third trial, Allen was jointly represented by two attorneys: Sidney Billingslea, the attorney who had represented Allen at his previous two trials, and Christine Schleuss, the attorney who had successfully pursued Allen's appeal after he was convicted of first-degree murder at his second trial.

In his petition for post-conviction relief, Allen asserted that Billingslea and Schleuss acted incompetently by failing to present the testimony of two potential defense witnesses, Jim Snyder and Michelle Kary Arms.

In support of this claim, Allen presented the affidavit of Public Defender Investigator Sue Hedge. During her investigation of Allen's potential application for post-conviction relief, Hedge located and then conducted telephone interviews of both Snyder and Arms.

According to Hedge's affidavit, Snyder "indicated to [Hedge] that he still remembered the incident [when Allen killed Labat]". According to Hedge's account of her conversation with Snyder, Snyder "was convinced that Labat had a gun on him that night, but that [Labat] had given [the gun] to [a woman companion] in [a] truck just before Allen started chasing him." Hedge also stated in her affidavit that Snyder "remembered Allen yelling things about the gun all during the incident."

In another portion of her affidavit, Hedge recounted her conversation with Arms. According to Hedge's affidavit, Arms said that she had been a witness to a phone conversation between Allen and Labat that occurred shortly before Labat came over to Allen's apartment. According to Hedge's affidavit, Arms said that she "was in bed with Allen [at the time,] and could hear Labat on the other end of the call." In her affidavit, Hedge stated that Arms "remembered Labat saying [that] he was going to come over to [Allen's] door with a gun and blow his head off", and that "Allen was scared and upset over [this] threatening call".

With regard to the fact that Arms did not appear as a witness at Allen's trial, Arms explained to Hedge that she knew that "someone from the defense was looking for her in regard to the case, but that they didn't find her [because she was] in California at the time."

When a petitioner for post-conviction relief contends that their trial attorney was incompetent in one or more respects, the

petitioner is required to seek an affidavit from the trial attorney in which the attorney addresses the petitioner's contentions.[2] Allen's petition for post-conviction relief contained affidavits from both Billingslea and Schleuss, as well as an affidavit from Richard J. Norgard, a defense investigator who was working for the Office of Public Advocacy at the time of Allen's third trial and who assisted Billingslea and Schleuss in their investigation and preparation of the case.

Neither Billingslea nor Schleuss nor Norgard disputed Allen's assertions about what Snyder and Arms would have said if called to the stand. Instead, in their three affidavits, Billingslea, Schleuss, and Norgard addressed the issue of why these two potential witnesses were not presented at Allen's trial.

With regard to Jim Snyder, Billingslea stated that she was "very interested in interviewing every person on the street that night who witnessed the incident between Mr. Allen and Mr. Labat, including Mr. Snyder." However, Billingslea explained that "[Snyder] did not want to be interviewed by the police, and did not stay at the scene."

Billingslea "[thought that she] originally pursued [Snyder] as a witness". However, after presenting Allen's defense at the first and second trials without Snyder's testimony, Billingslea was not sure "how aggressively [she and Schleuss] pursued him [when they were preparing] for the third trial." Billingslea added that "if [Snyder] had [had] anything helpful to offer as a witness, he would have been called, but I cannot remember ... whether he had any [helpful testimony] to offer."

In Schleuss's affidavit, she agreed with her co-counsel Billingslea that the defense team was interested in interviewing Snyder and "every [other] person on the street that night who witnessed the incident between Mr. Allen and Mr. Labat". Schleuss stated that she "want[ed] [their] investigator [i.e., Norgard] to find and interview" all of these potential witnesses.

However, according to Schleuss, even though the defense team "pursued [Snyder] as a potential witness for the third trial, [they] didn't find him." Like Billingslea, Schleuss noted that Snyder had not cooperated with the police and did not stay at the scene. However, Schleuss declared that the defense team had not made a strategic decision to refrain from calling Snyder because of his attitude or because of the anticipated content of his testimony. Rather, Schleuss said, "we just didn't find him to interview him."

Schleuss's account was corroborated by Investigator Norgard's affidavit. According to Norgard, he "tried to find and interview Mr. Snyder as a potential witness for the third trial, but never actually located him." Norgard stated that he tried to locate Snyder "us[ing] database searches" and "[by going] to his last known address", but these efforts yielded "negative results".

With regard to Michelle Kary Arms, Billingslea stated her in affidavit that she had known that Arms was a potentially helpful witness—that Arms "was listening in on the [phone] conversation [between Allen and Labat] and could have corroborated Allen's testimony about the call and the threats [made by Labat] in the call[,] as well as how the call frightened Allen." But Billingslea "[could] not remember why [the defense team] chose not to call her as a witness".

Schleuss, in her affidavit, added that she "[did] not remember making a strategic decision not to call [Arms] as a witness." In fact, Schleuss "[could not personally] remember whether [the defense team was] able to locate her." However, Schleuss stated that "Mr. Norgard's notes [which were apparently still in the defense file] indicate that we tried, but failed, to locate her."

In Norgard's affidavit (which is dated approximately two weeks after Billingslea's and Schleuss's affidavits), Norgard corroborated what the file notes indicated. Norgard stated that he knew that Michelle Kary Arms was a potential witness, and that he knew "the subject matter of her potential testimo-

2. *See Steffensen v. State*, 837 P.2d 1123, 1126–27 (Alaska App.1992); *State v. Jones*, 759 P.2d 558, 570 (Alaska App.1988).

ny." Norgard explained that he "attempted to locate and interview [Arms], but was unable to find her." According to Norgard, he "tried to locate [Arms] through her mother[,] and with database searches", but these efforts were not successful.

(We note that Investigator Hedge's later telephone conversation with Arms suggests that Norgard's efforts were partially successful—that Arms did in fact learn, at the time, that the defense team was looking for her, but she chose not to contact them.)

*The litigation of these allegations of attorney incompetence, and the superior court's ruling that Allen had failed to state a prima facie case for post-conviction relief*

In response to Allen's petition for post-conviction relief, the State filed a motion to dismiss the petition for failing to state a prima facie case for relief. With respect to the claims involving Snyder and Arms, the State offered three main arguments why Allen's petition was deficient on its face.

First, the State noted that Allen's petition was not supported by affidavits from Snyder and Arms themselves. Rather, the petition contained only the affidavit of Investigator Hedge, who offered hearsay accounts of what these two witnesses said during telephone interviews. The State argued that this was not sufficient.

Second, the State noted that even though Hedge was apparently able to locate Snyder and Arms during her investigation of the post-conviction relief matter, the affidavits submitted by Allen's two trial attorneys and by their investigator (Norgard) showed that the defense team had, in fact, tried to locate Snyder and Arms at the time of Allen's third trial, but their efforts were unsuccessful. The State argued that Allen's petition was deficient because Allen offered nothing to suggest that the defense team's efforts to locate Snyder and Arms had been incompetent.

Finally, the State noted that Snyder had not cooperated with the authorities and had left the scene before he could be interviewed, and that Arms had not come forward even after she apparently learned that the defense team was looking for her. Based on this, the State argued that there was no proof that Snyder and Arms would have cooperated with the defense team even if the defense had been successful in locating them.

Allen's pleadings in the superior court do not address the State's first point (that the petition did not include affidavits from Snyder and Arms themselves) or the State's third point (that there was no evidence that Snyder and Arms would have cooperated with Allen's defense team even if they had been located in time for Allen's third trial).

With regard to the State's second point (that Allen had failed to offer any evidence that his defense team's unsuccessful efforts to locate Snyder and Arms had been incompetent), Allen answered with a single conclusory sentence: "The [defense team's] efforts to locate [Snyder and Arms] were limited and minimal."

(This was simply a recapitulation of the conclusory assertions contained in Allen's petition: "The efforts to locate [these witnesses] were limited and minimal. More efforts should have been made to locate them.")

Allen then raised a point of his own. He suggested that the affidavits filed by his two trial attorneys (Billingslea and Schleuss) offered potentially conflicting explanations of why Michelle Arms was not called as a witness.

As explained above, Billingslea's affidavit stated that "[she could] not remember why [the defense team] chose not to call [Arms] as a witness". Allen argued that Billingslea's use of the word "chose" suggested that she and Schleuss made a conscious decision not to call Arms. Schleuss, on the other hand, stated in her affidavit that she "[did] not remember making a strategic decision" to refrain from calling Arms as a witness at Allen's trial. Rather, Schleuss said, it appeared from Investigator Norgard's file notes that the defense team "tried, but failed, to locate [Arms]."

(As further explained above, Norgard's affidavit corroborated Schleuss's affidavit on this point. Norgard stated that he was aware that Arms was a potentially valuable defense witness, and that he tried unsuccess-

fully to locate her, both by contacting her mother and by searching databases.)

Allen argued (in his opposition to the State's motion to dismiss) that because Billingslea's and Schleuss's explanations were potentially inconsistent, he was entitled to an evidentiary hearing to investigate and resolve this potential inconsistency.

After receiving these two pleadings (as well as a reply filed by the State), Judge Michalski granted the State's motion to dismiss Allen's petition.

With regard to Jim Snyder, Judge Michalski found that Allen's trial attorneys had made a conscious decision not to call him because "[Snyder] would have offered testimony adverse to Allen's interests".

■ (This finding is clearly erroneous. Neither of Allen's trial attorneys, nor their investigator, ever suggested that they knew what Snyder's testimony would be, or that they concluded that this testimony would have hurt Allen's interests. Instead, Billingslea and Schleuss stated that they did *not* know what Snyder's testimony would be (because he had not given a statement to the authorities), but that they were nevertheless interested in interviewing him (because he had witnessed the incident). In addition, both Schleuss and Norgard stated that they tried to locate Snyder, but they could not find him.)

With regard to Michelle Kary Arms, Judge Michalski found that, although Billingslea and Schleuss offered different statements about why Arms was not called as a witness, neither attorney's statement presented a prima facie case of attorney incompetence. Judge Michalski noted that Billingslea stated that she could not remember why Arms was not called as a defense witness, while Schleuss stated that, although she could not remember specifically, it appeared that the reason for not calling Arms as a defense witness was the fact that she could not be located. Judge Michalski ruled that neither of these attorneys' statements would support a finding of attorney incompetence.

*Why we uphold the superior court's dismissal of Allen's petition*

■ In his order dismissing Allen's petition, Judge Michalski did not discuss the State's first ground for dismissal: the fact that Allen did not obtain personal affidavits from either Snyder or Arms, but relied instead on Investigator Hedge's hearsay accounts of what those two witnesses would say. But although this ground for dismissal is not discussed in Judge Michalski's order, it is a valid objection to Allen's petition.

■ Alaska Criminal Rule 35.1(d) states (in pertinent part) that "[a]ffidavits, records, or other evidence supporting [the petitioner's] allegations shall be attached to the application [for post-conviction relief,] or the application shall recite why they are not attached." And in *State v. Jones,* this Court elucidated the scope of this requirement in cases where a petitioner's claim of attorney incompetence rests on the attorney's failure to present witnesses who would allegedly have given testimony favorable to the defense. In such cases, the petitioner has a duty "to allege and prove ... what would have been said by [the] potential witnesses who were not called"—in other words, a duty to produce evidence "to show ... that [these] potential witnesses would actually have given favorable testimony". *Jones,* 759 P.2d at 573–74.

Here, Allen offered the affidavit of his investigator, Sue Hedge, who held telephone interviews with the two proposed witnesses (Snyder and Arms) and who then summarized what these two witnesses told her. Ostensibly, this affidavit might have been sufficient to meet Allen's burden. But in our past decisions, we have indicated that the affidavits must come from the witnesses themselves, so that the court can see that the allegedly favorable testimony would actually be admissible.

For instance, in *Howell v. State,* 758 P.2d 103 (Alaska App.1988), we upheld the summary dismissal of a petition for post-conviction relief in which the defendant argued that his trial attorney had incompetently failed to call certain witnesses. Our decision was based, in part, on the fact that the defendant

"failed to submit any affidavits from [these] witnesses". *Id.* at 105 n. 1.

■ We discussed this point more explicitly in two unpublished decisions from 1993: *Rhames v. State*, Alaska App. Memorandum Opinion No. 2664 (April 7, 1993), 1993 WL 13156663; and *Elson v. State*, Alaska App. Memorandum Opinion No. 2739 (July 28, 1993), 1993 WL 13156823. Both *Rhames* and *Elson* contain the following explanation of the affidavit requirement:

> [W]hen a defendant asserts that his or her trial attorney failed to present important evidence (either because of incompetent trial tactics or because the attorney failed to competently investigate the case), the defendant must furnish the court with affidavits, depositions, or reports of the witnesses who stand ready to provide this evidence—or, failing this, the defendant must explain to the court why the witnesses' statements are unobtainable.

*Rhames*, 1993 WL 13156663 at *1; *Elson*, 1993 WL 13156823 at *15.

By requiring the defendant to present affidavits from the people who could actually give the proposed testimony in a court proceeding, we are following the rule that applies to the litigation of motions for summary judgement in other civil cases.

■ When motions for summary judgement are litigated, the ultimate question is whether the case presents any triable—*i.e.*, genuinely disputed—issues of material fact.[3] In such litigation, the parties normally rely on affidavits, depositions, admissions, answers to interrogatories, and similar evidentiary material that is produced outside of court hearings.[4] Nevertheless, "[i]f the parties choose to submit affidavits, [the affidavits] must be based upon personal knowledge, [must] set forth facts that would be admissible evidence at trial[,] and [must] affirmatively show that the affiant is competent to testify to the matters stated." *French v. Jadon, Inc.*, 911 P.2d 20, 24 (Alaska 1996); Alaska Civil Rule 56(e).[5] In other words,

hearsay statements that would be inadmissible at trial can not be employed to support or defend a motion for summary judgement. *French*, 911 P.2d at 24.

(*But see Adkins v. Nabors Alaska Drilling, Inc.*, 609 P.2d 15, 22 (Alaska 1980), holding that a court may consider a hearsay affidavit if no party objects.)

When the State asked the superior court to dismiss Allen's petition for post-conviction relief, the State noted that Allen had not produced an affidavit from either Snyder or Arms, and that Allen was instead relying solely on Hedge's affidavit to prove, through hearsay, the testimony that Snyder and Arms allegedly would have given if called to the stand at Allen's trial. This was a potentially fatal flaw in Allen's petition and supporting documents. And when Allen filed his opposition to the State's motion to dismiss, he offered no response on this point. He did not ask for more time to procure the personal affidavits of Snyder and Arms, nor did he offer an explanation of why he could not obtain their personal affidavits.

Moreover, Allen's case readily illustrates the need for the kind of requirements codified in Civil Rule 56(e) and reiterated in *French*. To prove the importance of Jim Snyder's testimony, Allen offered the affidavit of his investigator, Sue Hedge—an affidavit which offered a second-hand account of what Snyder purportedly would say if called to the stand. But even taking Hedge's account of her conversation with Snyder at face value, it is not clear that Snyder had any admissible testimony to offer.

According to Hedge's affidavit, Snyder "was convinced that Labat had a gun on him that night, but that [Labat] had given [the gun] to [a female companion] in [a] truck just before Allen started chasing him." But Hedge does not describe *why* or *how* Snyder became "convinced" of these things. Snyder's conclusions on these matters may not have been based on personal observation. Hedge also stated in her affidavit that Snyder "remembered Allen yelling things about

---

3.  *French v. Jadon, Inc.*, 911 P.2d 20, 24 (Alaska 1996).

4.  *Id.*

5.  *And see Williford v. L.J. Carr Investments, Inc.*, 783 P.2d 235, 238 n. 8 (Alaska 1989).

the gun all during the incident." But again, depending on the circumstances, Snyder's testimony about Allen's out-of-court statements might have been objectionable hearsay.

We take this opportunity to clearly state the requirement that a defendant seeking post-conviction relief must supply supporting affidavits from people who could testify to the pertinent information if called to the stand—or, alternatively, the defendant must explain why such affidavits can not be obtained.

Because our prior decisions—or, more precisely, our prior published decisions—have not expressly stated this requirement, we would not uphold the superior court's dismissal of Allen's petition on this ground alone. Rather, if we believed that the only deficiency in Allen's petition was the fact that he did not offer the personal affidavits of Snyder and Arms, we would vacate the superior court's order and allow Allen another opportunity to procure the required affidavits (or to offer an explanation as to why the affidavits could not be procured). However, we agree with the superior court that Allen's petition had other deficiencies.

As the State points out in its brief, Allen's complaints about his attorneys' failure to call Snyder and Arms to the stand at Allen's third trial are ultimately grounded on the assertion that his attorneys failed to make reasonable efforts to procure these two witnesses. Allen's complaints come to naught if his trial attorneys were unable, despite reasonable efforts, to locate Snyder and Arms.

Moreover, what constitutes a "reasonable effort" to find a witness hinges on the circumstances. As this Court noted in *State v. Jones,*

> [G]iven an unrestricted budget and freed of any constraints as to probable materiality or accountability, a lawyer might ... cheerfully log[ ] many hours looking for the legal equivalent of a needle in a haystack.... [A] millionaire might ... retain[ ] counsel to leave not a single stone unturned. However, a defendant is not entitled to perfection[,] but to basic fair-

ness. In the real [world], expenditure of time and effort is dependent on a reasonable indication of materiality.

759 P.2d at 572.[6]

Here, Billingslea and Schleuss were aware that Michelle Kary Arms had overheard the telephone conversation between Allen and Labat, and that she was therefore a potentially important defense witness (assuming that she was willing to corroborate Allen's account of that conversation). Thus, one might expect Billingslea and Schleuss to make significant efforts to locate Arms. On the other hand, there was no way to tell whether Jim Snyder had anything helpful to say. He had refused to cooperate with the authorities, and he had not given a statement. Billingslea and Schleuss knew that Snyder had witnessed the altercation in the street, but so had other people. As the two attorneys prepared for Allen's third trial, they might reasonably have concluded that their time and resources would be better spent on tasks other than extensive efforts to track down Snyder.

In the end, Billingslea's and Schleuss's investigator, Norgard, did in fact make attempts to locate both Michelle Arms and Jim Snyder—although these attempts were unsuccessful.

The fact that Norgard's efforts to find Arms and Snyder did not bear fruit does not mean that his efforts were incompetent. It is true that Allen's new investigator, Hedge, was able to locate both people—although this was years later and, at least with respect to Snyder, Hedge may have had a significantly different motivation to find him. But the ultimate question is whether Allen presented a prima facie case that Billingslea and Schleuss acted incompetently when they asked Norgard to find Arms and Snyder, or whether Norgard's ensuing attempts to locate these witnesses were so inadequate under the circumstances that they demonstrated incompetency.

In his affidavit, Norgard explained that he contacted Arms's mother, that he went to Snyder's last known address, and that he searched for both Arms and Snyder in data-

---

**6.**  Quoting *United States v. DeCoster,* 624 F.2d    196, 211 (D.C.Cir.1976) (*en banc* ).

bases (presumably, computerized databases). When the State (in its motion to dismiss Allen's petition) asserted that Allen had failed to present any evidence that these efforts were unreasonable or incompetent, Allen did not suggest how Norgard might have done better—either by proposing alternative methods that Norgard might have employed, or by explaining how Hedge had been able to locate the two witnesses. Instead, Allen responded by repeating the conclusory sentence he had offered in his petition: "The [defense team's] efforts to locate [Snyder and Arms] were limited and minimal."

This was not sufficient. To present a triable issue as to whether the defense team might have acted incompetently in their efforts to locate Arms and Snyder, Allen was obliged to present some evidence that these efforts were so unlikely to succeed, or were so inadequate in light of Allen's need for these witnesses, that no competent attorney would have been satisfied by these efforts. Allen presented no such evidence.

In his brief, Allen argues that Billingslea's affidavit suggests a different scenario: that, instead of looking for Michelle Kary Arms, the defense team simply reached a strategic decision not to present her testimony. Based on this interpretation of Billingslea's affidavit, Allen contends that he was entitled to an evidentiary hearing to sort out whether the defense team actually looked for Arms in the first place.

But Billingslea's affidavit does not support Allen's suggested interpretation. In her affidavit, Billingslea conceded that she had known that Arms was a potentially helpful witness for the defense, and she then stated that she "[could] not remember why [the defense team] chose not to call [Arms] as a witness". This statement—that Billingslea could not remember why the defense team decided to go to trial without Arms as a witness—does not contradict the information in Schleuss's and Norgard's affidavits: that the reason the defense team did not call Arms as a witness was that they could not find her.

▬ As Judge Michalski noted in his decision, a trial attorney's inability to remember the reason for a decision or action does not provide a ground for concluding that the decision or action was incompetent. Because the defendant bears the burden of affirmatively demonstrating the attorney's incompetence, a lack of evidence concerning the reason for the attorney's decision or action generally means that the defendant has failed to make a case for post-conviction relief.

▬ See *Jones,* 759 P.2d at 574 n. 8: "If the record ... is silent with regard to an issue and the witnesses are unable to remember, the state has not failed to substantiate its case; to the contrary, the prisoner has failed in his collateral attack on the judgment of conviction." [7] See also *Parker v. State,* 779 P.2d 1245, 1248 (Alaska App.1989): "In effect, Parker [takes] the position that, absent an affirmative explanation for his trial counsel's election to forego presenting character witnesses, his trial counsel's performance should be deemed incompetent. This position misallocates the applicable burden of proof and [it] has been squarely rejected."

The affidavits of Schleuss and Norgard explain that they went forward without Arms's testimony because they could not find her. Billingslea's affidavit states that she does not remember why they chose to go forward without Arms's testimony. There is no contradiction here. Moreover, regardless of whether one looks to Schleuss's and Norgard's explanation or, alternatively, Billingslea's inability to recall the explanation, neither account presents a prima facie case of attorney incompetence.

For these reasons, we conclude that Judge Michalski was correct when he ruled that Allen's petition failed to state a prima facie case of attorney incompetence.

### Allen's Blakely claim

As explained toward the beginning of this opinion, Allen was convicted of second-degree murder. This offense is not governed by presumptive sentencing. Instead, under AS 12.55.125(b)(2) (the version in effect at the

7. Quoting *Merrill v. State,* 457 P.2d 231, 234     (Alaska 1969).

time of Allen's offense), the superior court was authorized to sentence Allen to any term of imprisonment between 5 and 99 years.

However, in *Page v. State*, 657 P.2d 850 (Alaska App.1983), this Court established a benchmark sentencing range for second-degree murder: after examining the second-degree murder sentences that had previously been reviewed by the Alaska Supreme Court and by this Court, we concluded that a typical first felony offender convicted of a typical second-degree murder should receive a sentence of between 20 and 30 years to serve. *Id.*, 657 P.2d at 855.

The legal effect of the *Page* benchmark range is that sentencing judges who wish to impose more than 30 years to serve for the crime of second-degree murder must explain why they view the defendant as having a worse background than that of a typical first felony offender, or why they view the defendant's crime as worse than a typical second-degree murder. But as we explained in *Page*, the benchmark sentencing range "can only be a guide, not a rule"—because the legislature did not make second-degree murder subject to presumptive sentencing; instead, the legislature elected to retain indeterminate sentencing for this offense.[8]

For this reason, the *Page* rule does not require any particular finding to justify a sentence above the benchmark range. Rather, as we have repeatedly explained (indeed, as we explained in our decision of Allen's second appeal), a sentencing judge can exceed the 20- to 30-year *Page* benchmark range for any sound reason.[9]

██ Invoking the Supreme Court's decision in *Blakely*, Allen argues that even though the *Page* sentencing rule is only a benchmark, a defendant being sentenced for second-degree murder is entitled to a jury trial on any fact that the sentencing judge relies on when deciding to impose a sentence of imprisonment above the 20- to 30-year benchmark range. We rejected this same argument in *Carlson v. State*, 128 P.3d 197, 208–211 (Alaska App.2006). Our decision in

*Carlson* controls our resolution of Allen's claim.

*Conclusion*

For the reasons explained here, we agree with the superior court that Allen's petition for post-conviction relief failed to state a prima facie case for relief, either under the theory that Allen's trial attorneys acted incompetently when they failed to call Jim Snyder and Michelle Kary Arms as witnesses at Allen's third trial, or under the theory that the procedures at Allen's sentencing violated his right to jury trial under the Sixth Amendment as interpreted in *Blakely v. Washington*.

The judgement of the superior court is AFFIRMED.

---

8. *Page*, 657 P.2d at 855.

9. *Allen v. State*, 51 P.3d 949, 960 (Alaska App. 2002); *Brown v. State*, 973 P.2d 1158, 1162

(Alaska App.1999); *Williams v. State*, 809 P.2d 931, 933–34 (Alaska App.1991).