Jason L. CARLSON, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8498.

Court of Appeals of Alaska.

Jan. 27, 2006.

Paul E. Malin, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Jason L. Carlson was convicted of second-degree murder under the theory that he committed a homicide while acting with extreme indifference to the value of human life.[1] For this crime, Carlson was sentenced to 50 years' imprisonment with 10 years suspended—i.e., 40 years to serve.

Carlson was also convicted of five counts of evidence tampering (both for tampering with the existing evidence and for creating new, false evidence) and two counts of third-degree weapons misconduct (for possessing two different concealable firearms after having been adjudicated a delinquent minor based on conduct that would have been a felony if he had been an adult).[2]

In this appeal, Carlson raises four claims.

First, Carlson contends that his jury was misinstructed on the meaning of "extreme indifference to the value of human life". For the reasons explained here, we conclude that Carlson's jury was correctly instructed on the meaning of this phrase.

Second, Carlson contends that he was denied his Sixth Amendment right to jury trial when his sentencing judge, acting without a jury, decided to impose a sentence that exceeds the benchmark sentencing range for second-degree murder—20 to 30 years to serve—that this Court established in *Page v. State*, 657 P.2d 850, 855 (Alaska App.1983). For the reasons explained here, we conclude that a defendant being sentenced for second-degree murder has no right to a jury trial on the question of whether their sentence should or should not exceed the *Page* benchmark range.

Third, Carlson claims that the superior court erred in applying various aggravating factors to his sentences for evidence tampering and weapons misconduct. We conclude that these claims are moot, since Carlson's sentences on these seven counts were lawful even in the absence of any aggravating factors.

Finally, Carlson contends that his sentence is excessive. For the reasons explained here, we conclude that Carlson's sentence is not clearly mistaken.

Accordingly, we affirm Carlson's convictions and his sentence.

### Underlying facts

On the evening of September 24, 1998, the Anchorage police responded to a 911 call from a motorist regarding a potential homicide on King Street, near Dimond Boulevard. When a police officer arrived, he discovered a car parked on the side of the road, with a teenage boy slumped across the front seat. The boy's upper body was covered with a

---

1. AS 11.41.110(a)(2).

2. AS 11.56.610(a) and AS 11.61.200(a)(1), respectively.

jacket. When the officer removed this jacket, he discovered that the boy was covered in blood, that there was a hole in the boy's forehead, and that he was dead.

The boy was identified as 17–year–old George Featherly. A medical examination revealed that Featherly had died from a gunshot wound, and that the gun was fired only "fractions of an inch" behind his head.

The police found Featherly's pager and discovered that he had received a call that evening from Jason Carlson. Approximately five hours after Featherly's body was discovered, two police detectives went to interview Carlson at his home.

Carlson and Featherly had been best friends for the previous five years—"like brothers," according to Carlson. They saw each other nearly every day, and Featherly slept at Carlson's house almost every weekend. Carlson told the detectives that he had lost track of Featherly at the Dimond Center around 7:30 the previous evening, and that he did not know what had happened to him.

Four days later, after security tapes at the Dimond Center failed to corroborate Carlson's story, Detective Larry Arend interviewed Carlson again. After Arend told Carlson that his story was inconsistent with the content of the security tapes, Carlson admitted that he had been in the car when Featherly was shot. Carlson claimed that a black man named "Bee" or "B." had killed Featherly.

According to Carlson, Featherly had arranged to purchase a handgun that night from Bee. After spending the early part of the evening at the Dimond Center mall with Featherly, Carlson rode with him to meet Bee in the Red Robin parking lot off Dimond Boulevard. Bee got into the car and sat in the back seat behind Featherly. As they were driving on King Street, Bee pulled out a gun, pointed it at the back of Featherly's head, and demanded that Featherly give him money. Bee and Featherly exchanged racial slurs, and then Bee shot Featherly in the head. Carlson claimed that, after Bee shot his friend, Carlson jumped into the back seat of the car and shot Bee (with another gun, a Makarov, that was already owned by Featherly). Carlson told Arend that, although Bee was wounded, he managed to run away.

In the weeks following this September 28th interview, Detective Arend showed Carlson three photographic line-ups in an attempt to ascertain "Bee's" identity, but Carlson did not identify Bee in these photo line-ups. On October 14th, Arend interviewed Carlson again and directly challenged the truthfulness of Carlson's story.

On November 6th, Carlson's mother found a death threat note in front of Carlson's window. On that same day, the police informed Carlson's attorney that they had interviewed a woman who had seen Featherly's car on King Street when it first pulled over. This woman told the police that there were only two people in the car, and neither of these two people was black.

Three days later, on November 9th, Carlson changed his story again. He now admitted that he was the one who shot Featherly. Carlson told the police that the shooting was an accident: that he had been sitting in the back seat behind Featherly, holding a gun that Featherly had just bought, when the gun discharged. Carlson admitted that his previous story about "Bee" had been a lie. Carlson was arrested the next day for the murder of Featherly.

Carlson was indicted for first-degree murder, an alternative count of second-degree murder, plus five counts of evidence tampering and two counts of third-degree weapons misconduct. (Carlson had previously been adjudicated a delinquent minor for conduct that would have been a felony if he had been an adult, so he was prohibited from possessing a concealable firearm.)

At his trial, Carlson took the stand and reverted to the story that Bee had shot Featherly. Carlson admitted that one part of this story was false: he had not shot and wounded Bee after Bee killed Featherly. Carlson told the jury that he made this part up because he did not want anyone to think that he did nothing after seeing his friend murdered in front of him.

According to Carlson's testimony, once Bee fled the scene, Carlson jumped into the back seat of the car and retrieved the Maka-

rov that Featherly already owned. Carlson said that he used Featherly's coat to wipe his fingerprints off both car doors, and then he covered Featherly's body with the coat before he left.

When Carlson got home, he hid Featherly's Makarov in a stereo speaker. And, in an attempt to create an alibi for himself, he paged Featherly. Carlson testified that he did not tell the truth to the police because he "didn't want to get involved in it. [He] didn't want to get ... into any kind of trouble."

Carlson conceded that he had told the police that he was the one who shot Featherly, and that the shooting was accidental. Carlson explained that he had told the police this false version of events thinking that it would "get [everyone] off my back". Carlson asserted that he was prompted to fabricate the story of an accidental shooting because, at one point, Detective Arend had commented that if the shooting had been accidental, the investigation would be "another ball game".

Carlson testified that he had told his lawyer the truth about the shooting (*i.e.*, that Featherly had been shot by Bee), but Carlson said that his lawyer had advised him that the police would not believe this account. Carlson conceded that he "never told the truth ... to [Detective] Arend".

Carlson also admitted that he was the one who wrote the death threat note that his mother found by the window. Carlson indicated that he planted this note so that the police would step up their search for Bee.

At Carlson's first trial, the jury acquitted him of first-degree murder but convicted him of four counts of evidence tampering and one count of weapons misconduct. The jury was unable to reach a decision on the second-degree murder charge and on the remaining evidence tampering and weapons misconduct charges.

Carlson was tried a second time on these remaining charges. He again took the stand and offered the same version of events and the same explanation of his prior statements and misleading actions. The prosecutor argued that Carlson's confession to Detective Arend was much closer to the truth: "Jason

Carlson did the stupidest thing he's ever done in his life, which [was to] hold a gun [that] he didn't know ... was loaded to the back of George Featherly's head. The gun went off, and [Carlson has] been lying about it ever since."

This time, the jury convicted Carlson of second-degree murder and the remaining evidence tampering and weapons misconduct charges.

### The supplemental jury instruction on "extreme indifference to the value of human life"

As explained above, Carlson's indictment for second-degree murder was based on the theory that Carlson caused Featherly's death while engaging in conduct that, under the circumstances, "manifest[ed] extreme indifference to the value of human life". AS 11.41.110(a)(2).

During the jury's deliberations at Carlson's second trial, the jury asked for further explanation of the term "extreme indifference". In response to the jury's request, the trial judge—Superior Court Judge Donald D. Hopwood—conferred with the parties outside the presence of the jury.

The prosecutor asked Judge Hopwood to give the jury a supplemental instruction on "extreme indifference" drawn from the instruction that the Alaska Supreme Court approved in *State v. Johnson*, 720 P.2d 37, 39 (Alaska 1986). The instruction at issue in *Johnson* was:

> [A]n act "performed under circumstances manifesting an extreme indifference to the value of human life" is an act which creates a very high degree of risk and which exhibits an extreme disregard of social duty. It must be more than a criminally negligent act and more than a reckless act.... [A]n example of conduct covered by this provision would be shooting through a tent under circumstances [where] the defendant did not know a person was inside[,] or persuading a person to play "[R]ussian roulette".

*Johnson*, 720 P.2d at 38 n. 3.

The prosecutor suggested two additions to this instruction. First, the prosecutor asked

Judge Hopwood to add the following sentence from the 1978 legislative commentary to AS 11.41.110(a)(2): "The defendant is only required to intend to perform the act; there is no requirement that he intend to cause death or that he know that his conduct is substantially certain to cause death." [3] Second, the prosecutor recommended that the words "intend to perform" in the sentence just quoted be changed to "knowingly perform", to bring the wording of the legislative commentary in line with the 1988 amendment to the wording of AS 11.41.110(a)(2).

(In SLA 1988, ch. 66, § 1, the legislature changed the phrase "intentionally performs an act" to "knowingly engages in conduct". The legislature thus ratified the interpretation of the statute that this Court adopted in *Neitzel v. State*, 655 P.2d 325, 332–33 (Alaska App.1982): "AS 11.41.110(a)(2) requires that the actor ... knowingly engage in conduct causing the death of another which in light of the circumstances is reckless to the point that it manifests an extreme indifference to the value of human life.")

Although Judge Hopwood initially expressed concern that the prosecutor's proposed instruction tended to blur the distinction between "knowing conduct" and "circumstances manifesting an extreme indifference to the value of human life", the judge ultimately approved the proposed instruction. Accordingly, Judge Hopwood gave the jury the following supplemental instruction:

Conduct "performed under circumstances manifesting an extreme indifference to the value of human life" is conduct which creates a very high degree of risk and which exhibits an extreme disregard of social duty. It must be more than criminally negligent conduct and more than reckless conduct.

Examples of this sort of conduct are shooting through a tent under circumstances where the defendant did not know a person was inside, or persuading a person to play "Russian roulette." The defendant is only required to knowingly perform the act; there is no requirement that he intend[s] to cause death or that he knows

that his conduct is substantially certain to cause death.

On appeal, Carlson claims that this instruction impermissibly blurred the distinction between the conduct and the culpable mental state that must be proved for second-degree murder under subsection (a)(2). Carlson also claims that the instruction affirmatively misstated the law of second-degree murder: he contends that the first listed example of conduct constituting "extreme indifference to the value of human life" (shooting into a tent) does not, in fact, fall within the definition of "extreme indifference". Finally, Carlson argues that Judge Hopwood erred by giving *any* instruction defining the phrase "extreme indifference to the value of human life". None of these claims was preserved in the trial court.

When the parties discussed the prosecutor's proposed supplemental instruction, Carlson's attorney stated that he did not object to the language drawn from the *Johnson* opinion. Although the defense attorney remarked that he "[was] always nervous about defining these terms," the defense attorney then added, "I don't object to [the *Johnson* instruction] because I think it [accurately] conveys ... the meaning of ... 'extreme indifference to the value of human life'."

As explained above, the prosecutor proposed to augment the *Johnson* language with a sentence that contained examples from the legislative commentary. When Judge Hopwood expressed concern that this additional sentence might tend to blur the distinction between "knowing conduct" and "circumstances manifesting an extreme indifference to the value of human life", Carlson's attorney agreed that the instruction should not "vary from the instruction in *Johnson* [because] that [language] has been approved by the state supreme court." The defense attorney also told Judge Hopwood, "I think you're correct ... that [the additional sentence drawn from the legislative commentary] mixes two elements. I think it's dangerous to do that."

---

**3.** 1978 Senate Journal, Supp. No. 47 (June 12), page 10.

However, when Judge Hopwood ultimately decided to include the additional sentence from the commentary, Carlson's counsel did not object. Judge Hopwood read aloud the entire instruction, including the additional sentence from the commentary, and then he asked both parties whether they had further comment. Carlson's counsel replied, "No, Your Honor." And when, after a short recess, Judge Hopwood presented the parties with printed copies of the supplemental instruction, Carlson's attorney expressly stated that he had no objection.

Because Carlson did not object to the supplemental instruction, the question is whether this supplemental instruction constituted plain error.

Carlson contends that the challenged instruction impermissibly mixes the conduct element and the culpable mental state element of extreme indifference murder. He argues that the impermissible mixing is evident from the fact that the supplemental instruction refers to "conduct" or "act" seven times. From this, Carlson concludes that the supplemental instruction misleadingly focused on conduct, when the jury's question related to the culpable mental state of "extreme indifference to the value of human life".

But, as we noted in *Smith v. State,* many of the offenses in the Alaska criminal code are defined in terms of a result and a culpable mental state, without requiring proof of any particular conduct. For instance, manslaughter does not require proof of any particular type of conduct, but it does require proof that the defendant acted intentionally, knowingly, or recklessly with respect to the possibility that the defendant's conduct might cause another person's death, and it requires proof that the defendant's conduct caused the death of another.[4]

■ Like manslaughter, the offense of second-degree murder under an "extreme indifference" theory does not require proof of any specific conduct. As we explained in *Neitzel,* this offense requires proof (1) that

the actor caused the death of another through knowing conduct (any type of conduct), and (2) that, under the circumstances, the defendant's engaging in this conduct demonstrated such a high degree of recklessness as to manifest "extreme indifference to the value of human life".[5]

Carlson criticizes the supplemental instruction for repeatedly using the words "conduct" and "act". But, as the preceding two paragraphs of this opinion illustrate, it is quite difficult (if not impossible) to speak about concepts such as "recklessness" or "extreme indifference to the value of human life" without making generic references to a person's conduct or actions. We find no error (much less plain error) in the supplemental instruction's use of the words "conduct" and "act".

Carlson also claims that the supplemental instruction was affirmatively misleading regarding the element of "extreme indifference to the value of human life". He notes that the supplemental instruction refers to the example of a person's shooting into a tent when the person did not know whether the tent was occupied. Carlson claims that this example is erroneous, and that the proper example would be shooting into a house or tent when the shooter *knew* that the house or tent was occupied.

Carlson's argument is based on a mixing-up of the legislative commentaries to subsections (a)(1) and (a)(2) of AS 11.41.110.

Subsection (a)(1) of the statute declares that a person commits second-degree murder if, "[acting] with intent to cause serious physical injury to another person or knowing that [their] conduct is substantially certain to cause death or serious physical injury to another person, the person causes the death of any person". In its commentary to subsection (a)(1), the legislature cites the example of "[s]hooting into a crowded room without an intent to cause death or serious physical injury" as illustrative of the type of conduct that would be punishable under the second clause of subsection (a)(1).[6]

---

**4.** *Smith v. State,* 28 P.3d 323, 325–26 (Alaska App.2001).

**5.** *Neitzel,* 655 P.2d at 332–33.

**6.** 1978 Senate Journal, Supp. No. 47 (June 12), page 10.

But with regard to subsection (a)(2) of the statute, the legislative commentary does indeed cite the examples described in the supplemental instruction in Carlson's case: the examples of shooting into a tent when the shooter does not know whether the tent is occupied, and of encouraging another person to play Russian roulette.[7] Carlson is simply wrong when he asserts that the supplemental instruction mischaracterizes the examples contained in the legislative commentary.

Finally, Carlson argues that it was error to give the jury *any* supplemental definition of "extreme indifference to the value of human life". Carlson points out that, in *Neitzel*, this Court stated that trial judges should abide by the language of the statute when instructing juries on the culpable mental state required for extreme indifference second-degree murder, and that judges should avoid the phrases used at common law to define the culpable mental state for unintended murder—phrases such as "depraved heart", or "wicked disposition", or "wicked and depraved mind".[8]

■ This remains salutary advice. But the supplemental instruction in Carlson's case did not employ any of these nebulous common-law phrasings. Rather, the supplemental instruction was drawn directly from the examples contained in the legislative commentary to AS 11.41.110(a)(2). The supplemental instruction informed the jury of two situations that, according to the legislature, are examples of the kind of conduct encompassed by the offense of extreme indifference second-degree murder. This was the very clarification that the supreme court approved in *Johnson*. It was not error.

For these reasons, we reject Carlson's attacks on the supplemental jury instruction, and we accordingly affirm his conviction for second-degree murder.

*Judge Hopwood's authority to sentence Carlson to serve 40 years for second-degree murder, a sentence that exceeds the benchmark range of 20 to 30 years announced by this Court in Page v. State*

With the exception of certain murders of children, the penalty for second-degree murder in Alaska is currently 10 to 99 years' imprisonment. AS 12.55.125(b). However, Carlson faced a penalty range of 5 to 99 years because he committed his offense in 1998, when the minimum penalty for second-degree murder was 5 years' imprisonment.[9]

Shortly after Alaska's current criminal code went into effect, in *Page v. State*, 657 P.2d 850 (Alaska App.1983), this Court was asked to review the sentence of a defendant who received the maximum penalty for second-degree murder—99 years' imprisonment. In assessing whether this sentence was excessive, we examined the second-degree murder sentences that had previously been reviewed by the supreme court and by this Court.[10] Based on our review of those previous sentences and the facts of those previous cases, we established a benchmark sentencing range for second-degree murder: we concluded that a first felony offender convicted of a typical second-degree murder should receive a sentence of between 20 and 30 years to serve.[11]

In the two decades since *Page* was decided, we have continued to adhere to this 20-to 30–year benchmark range.[12]

The legal effect of the *Page* benchmark range is that sentencing judges who wish to impose more than 30 years to serve for the crime of second-degree murder must explain why they view the defendant as having a worse background than that of a typical first felony offender, or why they view the defendant's crime as worse than a typical second-degree murder. But as we explained in *Page*, the benchmark sentencing range "can

---

7. *Id.*

8. *Neitzel,* 655 P.2d at 336.

9. In 1999, the legislature increased the minimum penalty for second-degree murder from 5 years to 10 years: *see* SLA 1999, ch. 65, § 1.

10. *Page,* 657 P.2d at 854 n. 2.

11. *Id.* at 854–55.

12. *See, e.g., Soundara v. State,* 107 P.3d 290, 301 (Alaska App.2005); *Phillips v. State,* 70 P.3d 1128, 1143 (Alaska App.2003); *Allen v. State,* 51 P.3d 949, 960–61 (Alaska App.2002).

only be a guide, not a rule"—because "the legislature clearly could have made presumptive sentencing applicable to second-degree murder[ ]", but the legislature instead elected to retain indeterminate sentencing for this offense.[13]

Moreover, *Page* does not require any particular finding to justify a sentence above the benchmark range. As we have repeatedly explained, a sentencing judge can exceed the 20– to 30–year range for any sound reason.[14]

In Carlson's case, based on an evaluation of Carlson's background and conduct, Judge Hopwood concluded that Carlson's sentence should exceed the *Page* benchmark range. (He sentenced Carlson to serve 40 years.) Carlson argues that the judge's action violated his right to jury trial under the Sixth and Fourteenth Amendments to the federal Constitution, as interpreted by the United States Supreme Court in *Apprendi v. New Jersey, Blakely v. Washington,* and *United States v. Booker.*[15] Carlson contends that he was entitled to have a jury decide whether a sentence above the *Page* benchmark range was justified.

As we explain in detail later on, the basic principle behind *Apprendi, Blakely,* and *Booker* is to preserve the right of jury trial in the face of legislative attempts to divide offenses into "elements" (facts to be proved at trial) and "sentencing factors" (facts to be proved at the sentencing hearing). *Apprendi, Blakely,* and *Booker* hold that when the maximum punishment to which a defendant can be subjected varies according to the defendant's degree of offense, a defendant has the right to demand that a jury decide their degree of offense, and the right to demand that the factors which distinguish one degree of offense from another be proved beyond a reasonable doubt.

The *Page* benchmark range does not involve this legal principle. As we noted in

*Page,* the legislature exempted second-degree murder from the presumptive sentencing laws that were enacted in 1980. The legislature retained traditional sentencing for second-degree murder: this offense carries a range of punishment of 10 to 99 years' imprisonment (5 to 99 years at the time of Carlson's offense).[16] Within this range, sentencing is indeterminate; that is, the legislature has entrusted the sentencing decision to the judge's discretion.

*Page* governs a sentencing judge's exercise of discretion within this 10–to 99–year sentencing range by requiring the judge to state some good reason for imposing a greater-than-average sentence. But this sentencing decision is made only after a jury has determined, beyond a reasonable doubt, that the defendant is indeed guilty of second-degree murder—or after the defendant has waived the right to trial and has pleaded guilty. This jury verdict or guilty plea is the event that, by law, subjects the defendant to the 10– to 99–year penalty provided for this offense. *Page* does not alter the roles of the jury and the sentencing judge in this process, nor does it amend their spheres of authority within the criminal justice system.

While a sentencing judge's decision may involve an assessment of the facts of the defendant's particular offenses, the judge's decision ultimately rests on the answers to broader questions: the underlying causes of the defendant's criminal behavior, the defendant's likelihood of recidivism, and the defendant's amenability to rehabilitative efforts. These questions have traditionally been answered by a sentencing judge rather than a jury.

Accordingly, we conclude that the Sixth Amendment right to jury trial (and to proof beyond a reasonable doubt) does not apply to a sentencing judge's decision to impose a

---

13.  *Page,* 657 P.2d at 855.

14.  *Allen v. State,* 51 P.3d 949, 960 (Alaska App. 2002); *Brown v. State,* 973 P.2d 1158, 1162 (Alaska App.1999); *Williams v. State,* 809 P.2d 931, 933–34 (Alaska App.1991).

15.  *Apprendi,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000);

*Blakely,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004);
*Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

16.  AS 12.55.125(b).

sentence that exceeds the *Page* benchmark range.

### (a) The argument that can be made in favor of Carlson's position

Although we ultimately reject Carlson's Sixth Amendment argument, we acknowledge that his contention is reasonably debatable. In *Page*, this Court declared that a judge must have a sound reason for imposing a second-degree murder sentence of more than 30 years to serve—some good reason to distinguish the defendant from a typical first felony offender, or to distinguish the defendant's crime from a typical second-degree murder.[17] At first blush, this might resemble the kind of sentencing scheme that was at issue in *Blakely v. Washington.*

As we explain in more detail later, the problem presented in *Blakely* was that Washington law provided a technical "maximum" sentence for Blakely's crime, but Blakely's sentencing judge had no authority to impose that maximum sentence unless the judge found certain aggravating factors. The United States Supreme Court held that Blakely's true maximum sentence (for Sixth Amendment purposes) was the lesser sentence that represented the ceiling on the judge's sentencing authority in the absence of aggravating factors.

Carlson and other similarly situated defendants might plausibly argue that *Page* establishes a similar sentencing scheme governing second-degree murder—that even though the technical maximum sentence for second-degree murder is 99 years' imprisonment, *Page* establishes a 30–year ceiling that a sentencing judge can not exceed unless the judge finds some good reason for distinguishing the offender or the offense from the typical first felony offender who commits a typical second-degree murder.

To determine whether this analogy holds true—to decide whether the sentencing finding required by *Page* is the same sort of finding that was at issue in *Apprendi, Blake-*

ly, and *Booker*—we must examine the principle underlying the decisions in *Apprendi, Blakely*, and *Booker,* and then we must assess whether that principle is violated when a sentencing court makes the decision to impose a sentence that exceeds the *Page* benchmark range.

### (b) The principle underlying Apprendi, Blakely, and Booker: preserving the right to jury trial in the face of modern "determinate sentencing" laws

In *Apprendi v. New Jersey,* the Supreme Court assessed the constitutionality of a provision of state law (New Jersey's "hate crime" law) which increased the maximum sentence for various offenses. The defendant in *Apprendi* was convicted of possessing a firearm for an unlawful purpose. The normal maximum sentence for this crime was 10 years' imprisonment, but the hate crime law authorized a sentencing judge to impose an "extended term" of 20 years if the judge found (by a preponderance of the evidence) that the defendant had acted for the purpose of intimidating other people based on their race, religion, ethnic background, sexual orientation, etc.[18]

The New Jersey legislature and courts did not view the "hate crime" law as defining a separate substantive offense; rather, the law was seen as a sentencing provision that increased the sentencing range for a whole class of offenses, based on proof of a particular sentencing factor (the defendant's motive for committing the underlying crime).[19] Nevertheless, the Supreme Court declared that this type of sentencing provision implicated a defendant's right to notice, to trial by jury, and to proof beyond a reasonable doubt.[20] The Court explained:

> Any possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding. As a general rule, criminal proceedings

---

**17.** *Page,* 657 P.2d at 855.

**18.** *Apprendi,* 530 U.S. at 468–69, 120 S.Ct. at 2351.

**19.** *Id.,* 530 U.S. at 492, 120 S.Ct. at 2363–64.

**20.** *Id.,* 530 U.S. at 476–77, 120 S.Ct. at 2355–56.

were submitted to a jury after being initiated by an indictment containing "all the facts and circumstances which constitute the offence, ... stated with such certainty and precision, that the defendant ... may [...] determine the species of offence they constitute [and] prepare his defence accordingly ... and *that there may be no doubt as to the judgment which should be given,* if the defendant be convicted."

*Apprendi,* 530 U.S. at 478, 120 S.Ct. at 2356 (quoting J. Archbold, *Pleading and Evidence in Criminal Cases* (15th ed. 1862), p. 44) (emphasis in the *Apprendi* opinion).

The Supreme Court italicized this last portion of the quote from Archbold to emphasize that, in the eighteenth and nineteenth centuries, there was an "invariable linkage of punishment with crime".[21] In the words of Blackstone (quoted in *Apprendi* ), a sentencing court was obliged to "pronounce that judgment, which the law hath annexed to the crime".[22]

The Court explained that it was compelled to take action because, in recent years, new forms of sentencing statutes had begun to erode "[t]he historic link between verdict and judgment".[23] The problem, as explained by the Court, was that these statutes introduced "the novelty of a ... scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he [might] receive if punished according to the facts reflected in the jury verdict alone." [24]

We do not suggest that trial practices cannot change [over the] centuries.... But [criminal] practice must ... adhere to the basic principles undergirding the requirements of trying to a jury *all facts necessary to constitute a statutory offense,* and proving those facts beyond a reasonable doubt.

*Apprendi,* 530 U.S. at 483–84, 120 S.Ct. at 2359 (emphasis added).

This italicized language is, we believe, key to understanding the *Apprendi* decision. The Supreme Court viewed the New Jersey hate crime law as, in essence, creating a new group of statutory offenses—new, aggravated versions of the various underlying offenses to which the hate crime law applied. The Court declared that, whatever might be said in favor of "the constitutionally novel and elusive distinction between 'elements' [of an offense] and 'sentencing factors', ... the relevant inquiry is one not of form, but of effect—does the required finding [*i.e.,* the defendant's motive for committing the underlying offense] expose the defendant to a greater punishment than that authorized by the jury's ... verdict [finding the defendant guilty of that underlying offense]?" [25]

Having reached the conclusion that New Jersey's hate crime law actually created a new, aggravated form of the underlying crime of possession of a firearm for an unlawful purpose, the Supreme Court then declared that it was unconstitutional for the government of New Jersey to segregate one element of this offense, call it a "sentencing factor", and then have that element tried to the sentencing judge under a preponderance of the evidence standard.[26]

In *Blakely v. Washington,*[27] the Supreme Court extended the rationale of *Apprendi* to the context of determinate sentencing.

The defendant in *Blakely* pleaded guilty to second-degree kidnapping, a crime that carried a maximum sentence of 10 years' imprisonment under Washington law.[28] However, within this 10–year sentencing range, a judge's sentencing discretion was confined by a series of criteria that either called for particular sentencing ranges or that augmented or reduced the otherwise prescribed sentencing ranges. Thus, for instance, the

---

**21.** *Id.,* 530 U.S. at 478, 120 S.Ct. at 2356.

**22.** *Id.,* 530 U.S. at 478–79, 120 S.Ct. at 2356.

**23.** *Id.,* 530 U.S. at 482, 120 S.Ct. at 2359.

**24.** *Id.,* 530 U.S. at 482–83, 120 S.Ct. at 2359.

**25.** *Id.,* 530 U.S. at 494, 120 S.Ct. at 2365.

**26.** *Id.,* 530 U.S. at 494–97, 120 S.Ct. at 2365–67.

**27.** 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

**28.** *Blakely,* 542 U.S. at 299, 124 S.Ct. at 2534–35.

defendant in *Blakely* was subject to a standard sentencing range of slightly more than 4 years (49 to 53 months) because, among class B felonies, second-degree kidnapping had a "seriousness level" of V, and because Blakely had an "offender score" of 2, and because Blakely's use of a firearm during the commission of the kidnapping subjected him to a 36–month enhancement of the otherwise prescribed range.[29]

Despite this detailed sentencing calculus, Washington law authorized sentencing judges to impose a sentence above the prescribed sentencing range if the judge found "substantial and compelling reasons justifying an exceptional sentence".[30] In Blakely's case, the sentencing judge exceeded the prescribed range by more than 3 years (Blakely received 7½ years to serve) because the judge found that Blakely had acted with deliberate cruelty.[31]

The Supreme Court held that, under Washington's sentencing laws, the finding of deliberate cruelty was legally necessary to support the punishment that Blakely received[32]—and that, for this reason, Blakely was entitled to have a jury decide whether the state had proved this fact beyond a reasonable doubt:

> [T]he "statutory maximum" [sentence] for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* ... In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, ... the judge exceeds his proper authority.

*Blakely,* 542 U.S. at 303–04, 124 S.Ct. at 2537 (emphasis in the original).

Writing for the majority in *Blakely,* Justice Scalia explained that the Court's decision was based on "the need to give intelligible content to the right of jury trial".[33]

> [This] right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure.... [J]ury trial is meant to ensure [the people's ultimate] control in the judiciary.... *Apprendi* carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict. Without that restriction, the jury would not exercise the control that the Framers intended.

*Blakely,* 542 U.S. at 305–06, 124 S.Ct. at 2538–39 (citations omitted).

Justice Scalia then emphasized that the problem was not judicial fact-finding *per se,* but rather legislative encroachment on the right to jury trial.

> [T]he Sixth Amendment ... is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury.

*Blakely,* 542 U.S. at 308, 124 S.Ct. at 2540.

Thus, under a system of *indeterminate* sentencing—*i.e.,* a sentencing scheme in which the judge has the discretion to impose any term of imprisonment within a specified range of sentences—a sentencing judge does not violate the Sixth Amendment when the judge engages in fact-finding when choosing a sentence within the specified range:

> Indeterminate sentencing ... increases judicial discretion, ... but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty.... [I]ndeterminate [sentencing] schemes involve judicial factfinding, in that a judge ... may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But [these] facts do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference [on the issue of] judicial impingement upon the traditional role of the jury.... In a system that says the judge may punish

---

**29.** *Id.,* 542 U.S. at 299, 124 S.Ct. at 2535.

**30.** *Id.*

**31.** *Id.,* 542 U.S. at 300, 124 S.Ct. at 2535.

**32.** *Id.,* 542 U.S. at 303–05, 124 S.Ct. at 2537–38.

**33.** *Id.,* 542 U.S. at 305, 124 S.Ct. at 2538.

burglary with [a sentence of] 10 to 40 years, every burglar knows he is risking 40 years in jail. [But in] a system that punishes burglary with a 10–year sentence, with another 30 added for use of a gun, the burglar who enters a home unarmed is *entitled* to no more than a 10–year sentence—and by reason of the Sixth Amendment[,] the facts [that authorize any higher sentence] must be found by a jury.

*Blakely*, 542 U.S. at 309, 124 S.Ct. at 2540 (emphasis in the original).

The Supreme Court's most recent decision in this area, *United States v. Booker*,[34] contains an even more explicit explanation of the rationale underlying *Apprendi* and *Blakely*. Justice Stevens, writing for the majority, emphasized that the key constitutional problem was the erosion of the jury's traditional role in determining a criminal defendant's level of guilt, as more and more states (and the federal government) adopted determinate sentencing schemes—sentencing schemes that gave judges the power to resolve the factual disputes that would determine the upper limit of the defendant's punishment:

It is quite true that[, under indeterminate sentencing schemes,] judges commonly determined facts justifying [their] choice of a heavier sentence.... [But in] 1986, [we] first recognized a new trend in the legislative regulation of sentencing[: sentencing laws under which] facts selected by legislatures ... not only authorized, or even mandated, heavier sentences than would otherwise have been imposed, but increased the range of sentences possible for the underlying crime....

The effect of the increasing emphasis on facts that enhanced [the permitted] sentencing ranges ... was to increase the judge's power and diminish that of the jury. It became the judge, not the jury, that determined the upper limits of sentencing, and the facts [that] determined [the sentencing range] were not required to be raised before trial or proved by more than a preponderance [of the evidence].

As the [sentencing] enhancements became greater, the jury's finding of the underlying crime became less significant.

And the [sentence] enhancements became very serious indeed [—in some instances, dwarfing the initially prescribed sentence].

*Booker*, 543 U.S. at 236, 125 S.Ct. at 751 (citations omitted).

Justice Stevens explained that, given this development in sentencing law, "the Court was faced with the issue of preserving [the] ancient guarantee [of jury trial] under a new set of circumstances":

The new sentencing practice forced the Court to address the question [of] how the right of jury trial could be preserved [so that it would continue to guarantee], in a meaningful way[,] ... that the jury would still stand between the individual and the power of the government under the new sentencing regime. [I]t is the new circumstances ... that have led us to the answer ... developed in *Apprendi* and subsequent cases[,] culminating with this one. It is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance.

*Booker*, 543 U.S. at 237, 125 S.Ct. at 752.

With this explanation of *Apprendi, Blakely*, and *Booker* as our guide, we now turn to the question at hand: Under the Sixth Amendment, does a defendant have the right to insist that a jury decide whether the defendant should receive a sentence for second-degree murder that exceeds the *Page* benchmark range of 20 to 30 years?

*(c) Why we conclude that the right to jury trial announced in Apprendi, Blakely, and Booker does not apply to a sentencing judge's decision to exceed the Page benchmark range*

■ The Supreme Court's decisions in *Apprendi, Blakely*, and *Booker* all ultimately deal with the same issue: the limitation that the Sixth Amendment places on the government's power to define criminal offenses. To preserve the right to jury trial guaranteed by the Sixth Amendment, the Supreme Court has ruled that governments can not define criminal offenses in a manner that allows the prosecutor to present a stripped-down case

**34.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621    (2005).

to the jury and then, following the defendant's conviction, allows the sentencing judge to decide other factual issues which (if proved) will lift the sentencing ceiling—effectively convicting the defendant of an aggravated degree of the underlying offense.

But as the Supreme Court has repeatedly emphasized, this trilogy of cases does not affect the legality of judicial fact-finding in the context of indeterminate sentencing—that is, in a sentencing scheme where the penalty for a crime is a range of imprisonment, and the judge's task is to decide how to exercise the sentencing discretion afforded by this range of imprisonment. In this context, as Justice Scalia explained in *Blakely,* the facts found by the sentencing judge "do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference [as to whether the judge's fact-finding] impinge[s] upon the traditional role of the jury".[35]

Under Alaska law, the fact that a defendant has been found guilty of second-degree murder automatically subjects the defendant to a minimum sentence of 10 years' imprisonment and a maximum sentence of 99 years' imprisonment.[36] Within this range of punishment, sentencing is indeterminate; that is, no further fact-finding is necessary to invest the sentencing judge with the authority to impose any sentence within this range.

A judge's decision regarding what sentence to impose within the 10- to 99-year range for second-degree murder does not hinge on any particular fact relating to the defendant's conduct, mental state, or criminal history, or to any other circumstance surrounding the defendant's crimes. When the sentencing judge engages in fact-finding on any of these issues, this fact-finding is not done to establish the judge's legal authority to impose the selected sentence. Rather, this fact-finding is done to explain—to the defendant, to the public, and ultimately to a reviewing court—why the judge exercised their sentencing discretion in a particular manner.

Earlier, we described the argument that could be made in favor of Carlson's position in this appeal. The argument is this: An Alaska sentencing judge's discretion to impose a sentence within the 10- to 99-year range for second-degree murder is not unbounded. In *Page,* this Court declared that a judge must have a sound reason for imposing a second-degree murder sentence of more than 30 years to serve—some good reason to distinguish the defendant from a typical first felony offender, or to distinguish the defendant's crime from a typical second-degree murder. Because the sentencing judge must have some good reason to exceed the *Page* ceiling of 30 years, a defendant has the right to demand that a jury decide this question, and the right to demand that the government prove the grounds for a sentence exceeding 30 years beyond a reasonable doubt.

We reject this argument for three reasons.

First, the benchmark sentencing range announced in *Page* does not implicate the constitutional concern addressed in *Apprendi, Blakely,* and *Booker.* As explained above, these three decisions are aimed at preventing the government from subverting the right to jury trial by artificially dividing crimes into "elements" (facts that must be proved to a jury beyond a reasonable doubt) and "sentencing factors" (facts which increase the defendant's maximum punishment and which can be proved to a judge under some lesser standard). The *Page* benchmark range has nothing to do with reshaping the role of the jury in the criminal justice process. Rather, *Page* is this Court's attempt to regulate the expansive sentencing power that the legislature has given to judges who sentence defendants for second-degree murder. *Page* requires sentencing judges to think, and to explain, before they utilize the full extent of that sentencing power.

Second, the finding required by *Page* is not the same type of finding that was at issue in *Apprendi, Blakely,* and *Booker.* To a large degree, this conclusion follows from what we said in the previous paragraph.

---

**35.** *Blakely,* 542 U.S. at 309, 124 S.Ct. at 2540.

**36.** AS 12.55.125(b).

The constitutional problem in *Apprendi, Blakely,* and *Booker* was the attempt by various governments to segregate certain aspects of a crime—facts that would traditionally be viewed as elements of the crime (facts relating to the defendant's conduct, mental state, or criminal history, or other circumstances surrounding the crime)—and assign the decision of these facts to the sentencing judge by declaring these facts to be "sentencing factors".

In contrast, the finding required by *Page* does not necessarily turn on any factual aspect of the defendant's present offenses. Although a sentencing judge who complies with *Page* may mention or even rely on the facts of the defendant's present offenses, the ultimate question posed by *Page* is not one of historical fact. Rather, *Page* requires sentencing judges to explain their conclusions regarding the proper length of a defendant's sentence. Under Alaska law, this sentencing conclusion must be based on a weighing of the defendant's conduct and background against, or in light of, the various sentencing goals first announced in *State v. Chaney,* 477 P.2d 441, 444 (Alaska 1970), and now codified in AS 12.55.005.[37]

Rather than being a finding of historical fact, the finding required by *Page* (some sound reason for concluding that the defendant should receive a sentence longer than 30 years) is partly a weighing of imponderables and partly a prediction of the defendant's future behavior, based on the judge's assessment of the underlying causes of the defendant's criminal behavior, the defendant's likelihood of recidivism, and the defendant's

amenability to rehabilitative efforts. In other words, this finding does not look like any of the findings that are traditionally entrusted to the jury under our system of justice (save in those few states which give sentencing authority to juries).

(*Accord: People v. Black,* 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 756–58, 113 P.3d 534, 548–550 (2005); *State v. Rivera,* 106 Hawai'i 146, 102 P.3d 1044, 1054–58, 1059–1062 (2004); *People v. Rivera,* 5 N.Y.3d 61, 800 N.Y.S.2d 51, 56–57, 833 N.E.2d 194, 199–200 (2005); *State v. Lett,* 161 Ohio App.3d 274, 829 N.E.2d 1281, 1290–92 (2005) (*en banc*); *State v. Hughes,* 154 Wash.2d 118, 110 P.3d 192, 202 (2005).)

Third, and finally, it makes no sense to require the government to prove the necessity of a particular sentence beyond a reasonable doubt. Alaska law recognizes that sentencing is not an exact science. As our supreme court has said, appellate sentence review in this state "is founded on two concepts: first, that reasonable judges, confronted with identical facts, can and will differ on what constitutes an appropriate sentence; second, that society is willing to accept these sentencing discrepancies, so long as a judge's sentencing decision falls within a permissible range of reasonable sentences."[38] Because a sentencing decision involves the weighing of imponderables and a prediction of future behavior, it is self-defeating and fruitless to ask the government to prove that, beyond any reasonable doubt, a particular sentence is necessary.

---

**37.** AS 12.55.005 reads:

**Declaration of purpose.** The purpose of this chapter is to provide the means for determining the appropriate sentence to be imposed upon conviction of an offense. The legislature finds that the elimination of unjustified disparity in sentences and the attainment of reasonable uniformity in sentences can best be achieved through a sentencing framework fixed by statute as provided in this chapter. In imposing sentence, the court shall consider

(1) the seriousness of the defendant's present offense in relation to other offenses;

(2) the prior criminal history of the defendant and the likelihood of rehabilitation;

(3) the need to confine the defendant to prevent further harm to the public;

(4) the circumstances of the offense and the extent to which the offense harmed the victim or endangered the public safety or order;

(5) the effect of the sentence to be imposed in deterring the defendant or other members of society from future criminal conduct;

(6) the effect of the sentence to be imposed as a community condemnation of the criminal act and as a reaffirmation of societal norms; and

(7) the restoration of the victim and the community.

**38.** *State v. Hodari,* 996 P.2d 1230, 1232 (Alaska 2000), quoting this Court's decision in *Erickson v. State,* 950 P.2d 580, 586 (Alaska App.1997).

For these reasons, we conclude that the *Page* benchmark sentencing range does not implicate the Sixth Amendment concerns expressed in *Apprendi, Blakely*, and *Booker*. Accordingly, we conclude that a defendant convicted of second-degree murder has no right to a jury trial on the question of whether they should or should not receive a sentence above the *Page* benchmark range.

*Judge Hopwood's findings regarding the State's proposed aggravating factors from AS 12.55.155(c)*

Because second-degree murder is an unclassified felony, Carlson was not subject to presumptive sentencing on that charge; instead, he was subject to indeterminate sentencing within a range of 5 to 99 years' imprisonment.[39]

And, because Carlson was a first felony offender, he was not subject to presumptive sentencing on the other charges of evidence tampering and weapons misconduct. Both of these offenses are class C felonies and, at the time of Carlson's crimes, there was no presumptive term for first felony offenders convicted of a class C felony.[40] However, Carlson's sentencing was governed by former AS 12.55.125(k)(2), which declared that, in the absence of aggravating factors, a first felony offender convicted of a class C felony could receive no greater time to serve than the presumptive term that would apply to a second felony offender convicted of the same offense—in Carlson's case, 2 years.[41]

To provide the legal basis for sentences exceeding 2 years to serve for the various counts of evidence tampering and third-degree weapons misconduct, the State proposed two aggravating factors under AS 12.55.155(c): (c)(10)—that Carlson's conduct

was among the most serious within the definitions of these offenses; and (c)(19)—that Carlson had a prior delinquency adjudication for conduct that would have been a felony if he had been an adult.

Judge Hopwood found that the State had proved both of these aggravators by clear and convincing evidence. However, despite the proof of these aggravators, when Judge Hopwood sentenced Carlson for the five counts of evidence tampering and the two counts of third-degree weapons misconduct, he did not exceed the 2–year sentencing ceiling codified in former AS 12.55.125(k)(2). In fact, Judge Hopwood gave Carlson only 1 year to serve (*i.e.,* 2 years with 1 year suspended) on each count.

(In addition, although second-degree murder is not governed by presumptive sentencing, the State proposed one aggravator relevant to that crime as well: (c)(4)—that Carlson employed a dangerous instrument in furtherance of the homicide. Judge Hopwood found that the State had proved this aggravator. The legality of this finding is also a moot issue—both because second-degree murder is not governed by presumptive sentencing,[42] and because Judge Hopwood declared that he would not give any weight to this aggravator.)

On appeal, Carlson contends that Judge Hopwood committed various legal errors when he found the two aggravators relating to the offenses of evidence tampering and weapons misconduct. These contentions are moot. As just explained, Carlson received sentences of 2 years with 1 year suspended on each of the counts of evidence tampering and weapons misconduct. Judge Hopwood had the authority to impose these sentences even in the absence of any aggravators.[43]

---

39. AS 11.41.110(b) (second-degree murder is an unclassified felony); AS 12.55.125(b) (the sentencing provisions governing unclassified felonies) (in its pre–1999 form).

40. AS 11.56.610(b) (evidence tampering is a class C felony); AS 11.61.200(i) (third-degree weapons misconduct is a class C felony); AS 12.55.125(e) (the sentencing provision governing class C felonies) (in its pre–2005 form).

41. *See* former AS 12.55.125(d)(1) and 125(e)(1) (in their pre–2005 form).

42. *See Allen v. State,* 56 P.3d 683, 684–85 (Alaska App.2002).

43. *See State v. Gibbs,* 105 P.3d 145, 148 (Alaska App.2005). *Gibbs* involved the sentencing of a first felony offender for a class B felony. We held that any *Blakely* error committed by the sentencing judge when finding aggravating factors was moot—because the defendant received less time to serve than the 4–year presumptive term applicable to second felony offenders, and thus the defendant's sentence did not require proof of any aggravating factors.

This remains true even though Judge Hopwood imposed these seven sentences consecutively. Former AS 12.55.125(k)(2), otherwise known as the *Austin* rule,[44] limited Judge Hopwood's sentencing authority with respect to each count, but not with respect to the decision to run the separate sentences consecutively or concurrently. See *Castle v. State*, 767 P.2d 219, 221 (Alaska App.1989), where we distinguished between the *Austin* rule, which limits sentencing on individual counts, and the rule announced in *Farmer v. State*,[45] which requires "good cause", based on the totality of the circumstances, for imposition of consecutive sentences that, in combination, exceed the *Austin* limit for any one count.

### Carlson's argument that his sentence is excessive

For the crime of second-degree murder, Carlson was sentenced to 50 years' imprisonment with 10 years suspended—*i.e.*, 40 years to serve. For each of the five counts of evidence tampering and the two counts of weapons misconduct, Carlson received consecutive sentences of 2 years' imprisonment with 1 year suspended. Thus, Carlson's composite sentence is 64 years' imprisonment with 17 years suspended—*i.e.*, 47 years to serve.

Carlson argues that his sentence for second-degree murder improperly exceeds the 20- to 30-year benchmark sentencing range that this Court established in *Page*. He also argues that his composite sentence of 47 years to serve is excessive.

Carlson's argument regarding the *Page* benchmark is easily resolved. The *Page* benchmark sentencing range was intended to demarcate the range of actual imprisonment ("time to serve") that a sentencing judge should impose on a typical first felony offender convicted of a typical second-degree murder.[46] Carlson was not a typical first felony

offender because he had a prior delinquency adjudication for felony conduct. Moreover, Judge Hopwood found that Carlson had repeatedly perjured himself at his two trials. Addressing Carlson's testimony that a black man named Bee had shot Featherly, Judge Hopwood declared that Carlson's story was "patently false": "I listened to it twice, [and] I don't believe a word of it".

As we explained above, a sentencing judge is authorized to exceed the *Page* benchmark range for any sound reason. Both Carlson's prior history of delinquency and his repeated perjury are sufficiently sound reasons to exceed the *Page* benchmark range.

■ The real question is not whether Judge Hopwood was authorized to impose a sentence greater than 30 years to serve (the upper end of the *Page* benchmark range) for the crime of second-degree murder; rather, the question is whether Judge Hopwood was clearly mistaken in sentencing Carlson to a composite term of 47 years to serve.[47]

Carlson was a youthful offender: he was just shy of his eighteenth birthday when he shot Featherly, and he was nineteen years old when he was sentenced.

Moreover, Judge Hopwood stated that he did not view Carlson's conduct in this case as an aggravated instance of second-degree murder. Although Judge Hopwood found that Carlson "[held] a firearm within an inch of Mr. Featherly's head, . . . with his finger on the trigger, . . . [as] the car passed [over] a bumpy road", the judge stated that he could not find that Carlson knew the gun was loaded. The judge further declared that, although Carlson's culpable mental state fell within the statutory definition of "extreme indifference to the value of human life", Carlson's degree of indifference was not "highly extraordinary beyond the [statutory] definition".

**44.** *See Austin v. State*, 627 P.2d 657, 657–58 (Alaska App.1981).

**45.** 746 P.2d 1300, 1301–02 (Alaska App.1987).

**46.** *See Phillips v. State*, 70 P.3d 1128, 1143 (Alaska App.2003); *Brown v. State*, 4 P.3d 961, 964

(Alaska App.2000); *Sam v. State*, 842 P.2d 596, 603 (Alaska App.1992).

**47.** *See McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to uphold a sentencing decision unless the sentence is clearly mistaken).

These two factors—Carlson's youth, and the fact that his conduct was typical of second-degree murders—militate against an atypically long sentence of imprisonment. But other aspects of Carlson's conduct convinced Judge Hopwood that Carlson posed a particular danger to the public.

As explained above, Carlson had a prior delinquency adjudication for conduct that would have been a felony if committed by an adult. That delinquency adjudication was for the offense of theft—but "theft" only begins to describe what Carlson did.

Carlson's juvenile probation officer testified at his sentencing hearing in this case. The probation officer told the court that, in 1994, at the age of thirteen, Carlson and some of his friends broke into a neighbor's home. In addition to stealing property from inside the house, they also ransacked it— "breaking pictures, throwing paint [and] Tabasco sauce; [pouring] bleach and cleansers ... on the floor, [pouring] chemicals in[to] the aquarium, and ... urinat[ing] on the bedding." The damage totaled over $48,000.

Carlson went to trial (as a juvenile) on charges of first-degree burglary, second-degree criminal mischief, and second-degree theft. Carlson took the stand and denied any involvement in these crimes. The jury hung. Later, Carlson agreed to plead guilty to second-degree theft in exchange for dismissal of the other two charges and a promise that the State would not prosecute him for perjury.

But even "burglary", "theft", and "criminal mischief" do not fully describe Carlson's conduct—for, after the break-in, Carlson threatened the family whose house he and his friends had burglarized. As Judge Hopwood noted in his sentencing remarks, there were several occasions when Carlson saw the wife on the street and gave her menacing looks or called her debasing names. Carlson also stole the family's dog and hid the animal in an abandoned house. In the end, the family felt so threatened that they sold their house and moved to another neighborhood.

Judge Hopwood concluded that Carlson's conduct toward the family was "terrorizing behavior", and he added, "I don't use that word lightly". The judge stated that "[this] series of events ... tells me as much about [Carlson], and what I should do here, as what happened when he shot George Featherly."

Carlson's juvenile probation officer testified that, throughout Carlson's entire juvenile probation, he continued to deny his involvement in this episode. She stated that, at Carlson's juvenile disposition hearing, the judge "wanted to institutionalize him right there and then [based on] his lack of remorse." When, in 1997, the probation officer wrote her summary upon Carlson's discharge from juvenile probation, she declared that "[Carlson remains] a dangerous young man who never took responsibility for any of his actions".

In addition, the State presented evidence that Carlson had threatened the assistant district attorney who prosecuted him for murder. The State played a videotape of an incident that occurred as Carlson was being led from the courtroom following the jury's verdict at his second murder trial. Carlson stared into the prosecutor's face and declared, "I'll see you again."

Judge Hopwood concluded, based both on Carlson's juvenile conduct and his conduct in the present case, that Carlson's juvenile probation officer was correct when she stated that Carlson "will stand there in front of you and lie", that "he [is] very manipulative", that he "never takes any responsibility", and that "he is a dangerous young man". Judge Hopwood further concluded that Carlson "does not understand and does not care a whit about the effect his behavior has on other people":

> *The Court:* It's apparent in his conduct [and in his] testimony during the [murder] trial. It's apparent from his [acts of] evidence tampering and other evasive behavior. It's apparent in what he did to the neighbors whose house he ransacked. It's apparent in his comments to the prosecutor after the [second murder] trial.

Judge Hopwood also concluded that Carlson was especially dangerous because there did not seem to be a motive for his antisocial behavior, either in the present case or in the prior incident of juvenile delinquency.

*The Court:* [T]here was no motive for this behavior.... [And] I think it's important to note ... that ... this defendant ... doesn't need one. That's the problem. He can wreak havoc with other people's lives for no reason, and that's what's been happening.

Judge Hopwood concluded that Carlson's prospects for rehabilitation were poor, and that Carlson needed to be isolated to protect the public:

*The Court:* He's got deep-seated psychological issues that go far beyond just acting out by somebody who's a little confused because of immaturity.... [The need for] isolation is a factor here. I don't know if I've ever [before] had that as a sentencing objective for somebody who is not even twenty [years old], but it is [an objective] here. He is dangerous.

■ In sentencing Carlson, Judge Hopwood expressly recognized that the ultimate question was to decide what composite sentence Carlson should receive for his entire course of conduct—not just the murder, but also the several counts of evidence tampering and the weapons offenses. As the judge stated, "When we have multiple counts, a sentencing court is obligated to not focus on the individual sentences for those counts, but to look at the overall [sentence] and weigh the total against the defendant's overall conduct."

Judge Hopwood concluded that Carlson's composite sentence had to emphasize community condemnation of Carlson's entire course of conduct in the present case:

*The Court:* It's [his entire] behavior. It's the murder, but it's also ... what he did to attempt to evade responsibility and detection—the lies and the wasted police work ..., and what he told the victim's family, and so on. ... We're condemning that.

As already explained, Judge Hopwood did not consider the murder itself to be atypically serious. Rather, he found the other aspects of Carlson's behavior and history to be atypically serious: Carlson's behavior as a juvenile (the burglary, the theft and wanton destruction of property, and Carlson's later threatening behavior toward the family); Carlson's repeated acts of evidence tampering and, later, perjury in the present case; Carlson's threat to the prosecutor; Carlson's apparent lack of motive for his antisocial behavior; and Carlson's persistent refusal to accept responsibility for any of his actions.

■ "When a defendant [challenges] a composite sentence for two or more criminal convictions, this Court assesses whether the defendant's combined sentence is clearly mistaken, given the whole of the defendant's conduct and history." [48] Given the record in Carlson's case, and given Judge Hopwood's findings, we can not say that a composite sentence of 47 years to serve is clearly mistaken.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

48. *Custer v. State,* 88 P.3d 545, 549 (Alaska App. 2004) (footnotes omitted), citing *Brown v. State,* 12 P.3d 201, 210 (Alaska App.2000); *Jones v.* *State,* 765 P.2d 107, 109 (Alaska App.1988); *Comegys v. State,* 747 P.2d 554, 558–59 (Alaska App.1987).